## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AE LIQUIDATION, INC., *et al.*, | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ―――――――――――――――――― | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7  TRUSTEE, | ) | |
| | ) | Adv. Pro. No. 10-55543 (MFW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRUDENTIAL REAL ESTATE AND | ) | |
| RELOCATION SERVICES, INC., | ) | |
| AND PRUDENTIAL RELOCATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT PRETRIAL ORDER

Pursuant to the Local Rules for the United States Bankruptcy Court for the District of Delaware ("Bankr. LR") 7016-2(d) and the March 21, 2011 Scheduling Order [D.I. 7] signed by the Court, the parties hereby submit the following Joint Pretrial Memorandum in connection with the Trial scheduled for March 11 and 12, 2013 in adversary proceeding number 10-55543 (MFW), *Jeoffrey L. Burtch, Chapter 7 Trustee of AE Liquidation, Inc., et al. v. Prudential Real Estate and Relocation Services, Inc., and Prudential Relocation, Inc.*, (the "Adversary Proceeding").

## I.    A STATEMENT OF THE NATURE OF THE ACTION

The Adversary Proceeding is an avoidance action under 11 U.S.C. §§ 547 and 550. The Plaintiff also seeks disallowance of claims under 11 U.S.C. § 502(d) and (j). As described in further detail below, on November 23, 2010, the Plaintiff filed a complaint to commence this Adversary Proceeding seeking to avoid and recover preferential transfers (the "Complaint") against Prudential Real Estate and Relocation Services, Inc., and Prudential Relocation, Inc. (collectively the "Defendants" or "Prudential") [D.I. 1]. The Complaint includes an Exhibit A reflecting $781,702.61 in transfers. On February 7, 2011, Prudential filed an answer (the "Answer") to the Complaint [D.I. 4]. The Answer asserts ordinary course of business, ordinary business terms and new value affirmative defenses pursuant to 11 U.S.C. § 547(c). The Answer does not contain counterclaims or crossclaims.

## II.    BASIS FOR JURISDICTION

This Court has subject matter jurisdiction over this Adversary Proceeding, which arises under Title 11, arises in, and relates to a case under Title 11, in the United States Bankruptcy Court for the District of Delaware (the "Court"), Case No. 08-13031 (MFW) [the "Main Case"],

2

pursuant to 28 U.S.C. §§ 157 and 1334(b).    The Adversary Proceeding concerns the determination, allowance, and amount of claims under 11 U.S.C. §§ 502, 547 and 550.    The Adversary Proceeding is a "core" proceeding, to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(2).

Venue is proper in this District pursuant to 28 U.S.C. § 1409 in that this Adversary Proceeding arises in and relates to a bankruptcy case pending in this District.

### III.    BANKRUPTCY COURT ADJUICATORY AUTHORITY

The nature of the claim is a Section 547(b) preference action of the Bankruptcy Code. The parties consent to the Bankruptcy Court adjudicatory authority to render final orders or judgments in the adversary proceeding, pursuant to the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.

### IV.    A STATEMENT OF FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF.

1.    On November 25, 2008 (the "Petition Date"), the Debtors[1] commenced their respective reorganization cases (collectively, "Bankruptcy Cases") by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code §§101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

2.    The ninety-day period prior to the Petition Date ran from August 27, 2008 to November 25, 2008 (the "Preference Period").

3.    On November 23, 2010, Jeoffrey L. Burtch, (the "Trustee" or the "Plaintiff") filed his Complaint to commence this Adversary Proceeding seeking to avoid and recover preferential transfers against Prudential   [D.I. 1]. The Trustee seeks to avoid $781,702.61 in transfers as

---

[1] The Debtors are: AE Liquidation, Inc. (f/k/a Eclipse Aviation Corporation, "Eclipse" or "EAC", or the "Debtor") and ERIB Liquidation, Inc. (f/k/a Eclipse IRB Sunport, LLC), a wholly owned subsidiary of Eclipse Aviation Corporation.

identified on Exhibit A of the Complaint (the "Transfers", individually a "Transfer"). The Complaint is attached hereto as Plaintiff Exhibit 1, and Exhibit A is attached hereto as Plaintiff Exhibit 2a, 2b, and 2c.

4.    Exhibit A of the Complaint, (the "Eclipse Excel Spreadsheet Payment History") reflects payments made by the Debtor to Prudential prior to and during the Preference Period, and each invoice on the chart relates to certain services which were provided by Prudential to the Debtor on or before the date of invoice or the date of the Weekly Billing List. *See* Plaintiff Exhibit 2a and 2c; *see also* Plaintiff Exhibit 68, S.O.F.A., Section 3(b).

5.    Prior to the Petition Date and during the Preference Period, Prudential received the following Transfers from the Debtor:

| Payment Doc | Check Number | Payment Date | Amount Paid | Cashed/Void Dt | Payment method |
|---|---|---|---|---|---|
| 20054795 | 56817 | 8/27/2008 | $50,890.09 | 9/2/2008 | Check |
| 20054964 | 56973 | 9/3/2008 | $50,964.05 | 9/8/2008 | Check |
| 20055128 | 57127 | 9/10/2008 | $49,928.66 | 9/15/2008 | Check |
| 20055308 | 57301 | 9/17/2008 | $51,965.13 | 9/22/2008 | Check |
| 20055454 | 57436 | 9/24/2008 | $50,405.51 | 9/29/2008 | Check |
| 20055600 | 57579 | 10/1/2008 | $74,791.02 | 10/6/2008 | Check |
| 20055734 | 57710 | 10/8/2008 | $75,080.53 | 10/14/2008 | Check |
| 20055884 | 57858 | 10/15/2008 | $76,892.83 | 10/20/2008 | Check |
| 20056083 | 58049 | 10/22/2008 | $74,907.61 | 10/27/2008 | Check |
| 20056189 | N/A | 10/30/2008 | $74,718.23 | 10/30/2008 | Wire Transfer |
| 20056242 | N/A | 11/6/2008 | $76,179.85 | 11/6/2008 | Wire Transfer |
| 20056318 | N/A | 11/20/2008 | $74,979.10 | 11/20/2008 | Wire Transfer |
| | **Total** | **Transfers** | **$781,702.61** | | |

6.    Each of the above-referenced Transfers was made payable to "Prudential Relocation" and deposited in a Prudential bank account ("Funds"); Prudential had actual control of the Funds and their distribution.

7.    The Defendants were providers of relocation services sold to and used by the Debtor.

4

8.      Each of the above-referenced Transfers represented an interest of the Debtor in property as required by 11 U.S.C. § 547(b).

9.      Each of the above-referenced Transfers was made to or for the benefit of a creditor pursuant to 11 U.S.C. § 547(b)(1).

10.     Each of the above-referenced Transfers was to or for the benefit of creditors of the Debtor and were made in payment of antecedent debts owed by the Debtor before such transfers were made, pursuant to 11 U.S.C. § 547(b)(2).

11.     Each of the above-referenced Transfers was for or on account of an antecedent debt owed by the debtor before such transfer was made, and paid amounts due and owing in connection with invoices sent by the Defendants for the total amounts indicated in the Transfers.

12.     The Trustee has the presumption of insolvency under 547(f) of the Bankruptcy Code.

13.     Each of the above-referenced Transfers was made on or within 90 days of the Petition Date as required by 11 U.S.C. § 547(b)(4).

14.     To the extent the Transfers are avoidable pursuant to section 547 of the Bankruptcy Code, Prudential does not challenge the Trustee's right to recover such transfers from the Defendants pursuant to section 550.

15.     For Count II of the Complaint, pursuant to Section 550, Prudential's Answer to Plaintiff's Request for Admission No. 15 admitted:

> 15) Admit that the Transfers were made for the benefit of the Defendant or the Defendant's immediate or mediate transferee."

> **Response:**    "… Prudential responds as follows: Admit."

*See* Plaintiff's Exhibit 12.

16.    On February 7, 2011, Prudential filed an Answer to the Complaint [D.I. 4], attached hereto as Plaintiff's Exhibit 7.

17.    Prudential filed a proof of claim on August 11, 2009 in the Debtor's Main Case.

18.    For the Section 547(c)(2) ordinary course defense, Prudential's Answer to Plaintiff's Request for Admission No. 17 admitted:

> 17)    "Admit that at some time during the Preference Period, the Defendant placed Eclipse's account status on at least one of the following Defendant's reports: collection account report, bad debt report, monthly days sales outstanding report, delinquent account report, problem account report, or some similar Defendant named past due account receivable report."
>
> **Response:    "... Prudential responds as follows: Admit."**

*See* Plaintiff's Exhibit 12.

## V.    A STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED.

19.    For the Section 547(b)(3) insolvency element, Prudential has neither admitted nor denied insolvency, nor provided a rebuttal expert on insolvency. Thus, the Debtors' presumption of insolvency element, Section 547(b)(f), is not rebutted.

20.    Each of the above-referenced Transfers allowed the creditor Defendants to receive more than such creditors would receive if (A) the case were a case under chapter 7 of 11 U.S.C.; (B) the transfer had not been made; (C) and such creditors received payments of such debts to the extent provided by the provisions of 11 U.S.C., as required by 11 U.S.C. § 547(b)(5).

21.    The Trustee contends for the Section 547(b)(5) element, there is currently less than $7 Million available for the Trustee's commission and for distribution to the general

creditors of the Chapter 7 estate of AE Liquidation, Inc.[2]  These creditors include holders of chapter 7 administrative expense claims, chapter 11 administrative expense claims, holders of priority claims (see generally 11 U.S.C. Section 507(a)(3)–(8)).  Without prejudice to other allowed amounts that may be approved by this Court that would reduce the amount available for distribution to the general creditors of the Chapter 7 estate of AE Liquidation, Inc., it is true that claims, as filed, exceed the amount of $900,000,000.00.  One set of those claims are the deficiency claims of the 8% Senior Noteholders for Senior Secured Notes due 2012.  By final court order, those deficiency claims have been allowed in the approximate amount of $567,000,000.00. [D.I. 714 (Stipulation and Agreed Order)].  By final order, this Court has allowed a chapter 11 administrative expense claim in the amount of $1,849,449.00 for the benefit of Computer Sciences Corporation. [D.I. 1011].  By final order, this Court has allowed chapter 11 administrative expense claims in the amount of $519,285.98 for the benefit of Bernalillo County Treasurer.  [D.I. 1295].  Other claims have been filed as chapter 11 administrative expense claims in an unliquidated amount. According to the Claims Register maintained by the Court, priority claims have been filed in the aggregate asserted at a minimum amount of $1,952,148.66. According to the Claims Register filed with the Court by the Chapter 11 claims agent, additional claims have been filed asserting priority in the amount of $4,661,002.53. According to the Claims Register maintained by the Court, general unsecured non-priority claims have been filed in an aggregate amount vastly in excess of $730,000,000.00 (seven hundred thirty million dollars).  Therefore, holders of allowed, general unsecured non-priority claims will not receive full payment upon such claims.

---

[2] The Trustee also holds approximately an additional $1M, however these monies are earmarked for special parties such as secured creditors or the buyer of assets, and as generally discussed in a sale order entered in 2009.

22.    For the Section 547(c)(4) new value defense the Trustee will consent to a total of $56,057.42. Prudential contends that the proper amount of new value is **$128,379.40.**

23.    For Section 547(c)(1) contemporaneous exchange of new value defense, whether the Defendants are able to show the mutual intent element and that the transactions were substantially contemporaneous.

24.    Whether Prudential is entitled to and able to prove a Section 547(c)(2) ordinary course defense or that the payments were made in the "ordinary course of business": when during the Preference Period the first lump sum payment plan was a five week, $50,000 per week plan paying aged invoices.  Then Prudential forced, via an ultimatum email, a seven week, $75,000 per week payment plan or threatened termination of service.  The $75,000 transfers initially paid current invoices. Then for the last four weeks Prudential forced payments on weekly billing list and the invoices were issued after the transfer was received.  Also the last three transfers were by wire, and the last two wires were not from the operating account but from the employee payroll account.    This payment fact pattern is extremely well documented from Prudential's own document production."

Prudential's facts and arguments on the ordinary course defense are located herein under Section VI. "Defendant's Section of Issues of Law That Remain to Be Litigated", at pages 34 – 38.

25.    Whether Prudential can establish a Section 547(c)(2) ordinary business terms defense.

### VI.    PLAINTIFF STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED.

### 1.    The Trustee's Authentication of the Debtor's Records.

These cases converted to cases under Chapter 7 on March 5, 2009 [D.I. 535 (Order)]. The Trustee was appointed as interim trustee on March 5, 2009, pursuant to Section 701 and is serving as the Trustee of these estates (the "Estates") pursuant to Section 702(d) of the Bankruptcy Code.

Andrew Kamm, Vice President of Finance for the Debtors, on July 7, 2009 and thereafter, in partial conformity and pursuant to Section 521(a)(4) turned over to the Trustee financial records of the Debtors, including but limited to, the Excel Spreadsheet Payment History, copies of the canceled checks, records of the original invoices, bank statements and more. *See* Plaintiff Exhibit 72; *see also* Plaintiff Exhibit 68, the Debtor's Statement of Financial Affairs ("S.O.F.A."), Section 19(c) and Section 19(a) attachment.

Pursuant to Section 521(a)(4):

> "[t]he debtor shall … if a trustee is serving in the case or an auditor is serving under section 586(f) of title 28, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title;…"

On July 22, 2011 the Trustee filed a Motion to Employ Sutin, Thayer & Browne, P.C. (hereinafter "The Sutin Firm") as litigation assistance counsel for the Chapter 7 estates, nunc pro tunc to July 12, 2011 (the "Application") [Main Case D.I. 1324].    The Sutin Firm's responsibilities for the Trustee included but is not limited to:

> "Without limitation, the Trustee contemplates that the primary work of the Sutin Firm will relate to the review and analysis of, and obtaining from Eclipse Aerospace, Inc: (1) Financial information of the Debtors, and (2) Other books and records and other information which comprised part of the Purchased Assets purchased by Eclipse Aerospace, Inc. and located in Albuquerque under the control of Eclipse Aerospace, Inc."

*See* Plaintiff Exhibit 70.

9

On August 8, 2011, the Court entered the *Order Authorizing the Chapter 7 Trustee to Employ Sutin, Thayer & Browne, P.C. as Litigation Assistance Counsel to the Trustee Nunc Pro Tunc to July 12, 2011,* to assist the Trustee in the performance of his duties, including, but not limited to review of books and records of the Debtor, (the "Employment Order") *See* Plaintiff Exhibit B [Main Case D.I. 1333]. *See* Plaintiff Exhibit 71. In 2011 and thereafter, The Sutin Firm obtained, analyzed, and transferred additional records of the Debtor to the Trustee.

Eclipse developed and manufactured twin turbofan jet aircraft, specifically known as the Eclipse 500. Eclipse engineered, manufactured and sold the Eclipse 500 through its manufacturing and headquarters facilities in Albuquerque, New Mexico, and provided full service maintenance and repair services through its three service centers located in Albuquerque, New Mexico, Albany, New York, and Gainesville, Florida. Eclipse also operated a pilot training facility located in Albuquerque at which it trained pilots to operate the Eclipse 500.

*United States v. Elkins*, 885 F.2d 775, 785 (11th Cir.1989) (authentication is governed by Federal Rules of Evidence 901-903 and is generally "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Fed.R.Evid.* 901(a). Authentication only needs "some competent evidence in the record to support authentication," which may be merely circumstantial evidence.).

*American Auto. Ass'n v. AAA Legal Clinic*, 930 F.2d 1117, 1120 (5th Cir. 1991) (a matter that is "admitted" does not require further proof, and any admission that is not amended or withdrawn cannot be rebutted by contrary testimony or ignored by the court even if the party against whom it is directed offers more credible evidence).

*In re Batie*, 995 F.2d 85, 89 (6th Cir. 1993), *Green v. United States*, 447 F.Supp. 885, 890 n.2 (N.D.Ill. 1978), *Rea v. Wichita Mortg. Corp.*, 747 F.2d 567, 574n.6 (10th Cir. 1984)

10

(documents plaintiff produced in discovery as part of the plaintiff's answers to the defendants' discovery requests for interrogatories and admissions in this adversary action need not be authenticated).

Butcher v. Bailey, 753 F.2d 465 (6th Cir.1985), ("the Court held that the production of documents [pursuant to Section 521(a)(4)] constituted an act which operated as an authentication of records and that the debtor's production of records was a testimonial act.")

In re Walsh Trucking Co., Inc., 67 B.R. 863, 865 (Bankr. D.N.J. 1986) and United States v. Doe, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) ("the act of turning … [the debtor's business records] over to the trustee is a testimonial act and would allow a trier of the fact to draw the inference that the mere act of turning over such documents is in itself an authentication of the documentation).

Ament v. Townsend, 1998 WL 299806 *4 (N.D.Ill. 1998) (Courts have allowed professionals of the estate to authenticate documents from the debtor's books and records, "averred that the copies of the checks and invoices were true and accurate copies of documents obtained from the debtors' books and records or from the respective banks. The affiant thus authenticated the documents, making them admissible as evidence.").

Marvin A. Sicherman (In re Sol Bergman Estate Jewelers, Inc.) v. Diamoncut, Inc., 225 B.R. 896, 901-902 (6th Cir.BAP 1998) (defendant argued that the trustee's exhibits were never properly authenticated by a witness with personal knowledge pursuant to Federal Rule of Evidence 901:

> The foundation for admissibility obtained from an authenticating witness proffering a business record, a summary based thereon, or secondary evidence thereto, **does not require the witness to have personal knowledge of the actual events reflected in the business record.** United States v. Weinstock, 153 F.3d 272, 276 (6th Cir.1998) (citation omitted). The witness "need only be familiar with the company's recordkeeping

11

practices." *Id.* The *Diamoncut* Court stated "[i]f the witness lacks personal knowledge of the recorded events, this is considered by the trier of fact only in determining the credibility of the witness and the weight to be accorded" the witness's testimony and the exhibits admitted into evidence through the witness's testimony. *"United States v. Stavroff*, 149 F.3d 478, 484-485 (6th Cir.1998) (citation omitted).").

*United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990) (held "[i]t is not necessary that the person who actually prepared the business record testify, nor that the document be prepared by the business which has custody of it, so long as other circumstantial evidence suggests the trustworthiness of the record", checks did not require extrinsic evidence of authenticity. As a negotiable instrument, a check is a species of commercial paper, and therefore self-authenticating. *Fed.R.Evid.* 902(9)).

*In re Bennett Funding Group, Inc.*, 220 B.R. 743, 763, fn.18 (Bankr. N.D.N.Y. 1997) (concluded "[i]n the absence of specific evidence from which to draw an inference to the contrary, the Court cannot blanketly conclude that the books and records relied upon by the Trustee are unreliable in their entirety).

*In re Baker & Getty Financial Services, Inc.*, 98 B.R. 300, 305 (Bankr.N.D.Ohio 1989) ("points out the self-authenticating nature of commercial paper and related documents pursuant to Fed.R.Evid. 902.").

*In re Miller*, 310 B.R. 185, 191 (Bankr.C.D. Calif. 2004) ("A check is a species of documents called 'commercial paper,' 'instruments' or 'negotiable instruments.' *See* UCC § 3-104.").

*United States v. Pang*, 362 F.3d 1187, 1191-3 (9th Cir. 2004) ("As a negotiable instrument or commercial paper, a check is self-authenticating)(invoices [charts and emails] produced by the defendant in discovery are admissions by the defendant and "therefore non-hearsay as defined by Rule 801(d)(2).")("[c]hecks themselves, together with the tellers'

12

markings and routing stamps, ... are commercial events which create legal rights and obligations, and therefore no exception to hearsay need be found" to admit checks into evidence)(invoices are not self-authenticating under Rule 902(9). The invoices paid by the preference Transfers are what they are purported to be. The Trustee produced the invoices in discovery, and are identical to invoices Prudential produced in their discovery responses. The invoices basically match by invoice date, invoice number, and invoice amount, correlate dollar-for-dollar, and the cancelled checks on the Trustee's Exhibit A to the Complaint, the Debtor's Excel Spreadsheet Payment History, and Prudential's list of invoices paid by the Transfers received. *See* Plaintiff Exhibit 73, (PR-E 00125-00134), Prudential Admission of Invoices paid and Preference Checks Received). The authentication requirement is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Fed.R.Evid.* 901(a). The Plaintiff does not need personal knowledge at the time the documents were created to establish a proper foundation. A proper foundation "'can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902.' *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9[th]Cir. 2002).").

> *United States v. Carriger*, 592 F.2d 312, 316 (6th Cir.1979) (UCC § 3-308(a) "creates a presumption that commercial paper offered in evidence is authentic and dispenses with a requirement of extrinsic evidence for admissibility).

> *In re Baker & Getty Financial Services, Inc.*, 98 B.R. 300, 305 (Bankr.N.D.Ohio 1989) (finding copies of checks, bank records, and a letter acknowledging a wire transfer self-authenticating and admissible in support of motion for summary judgment).

## 2.    Is the Plaintiff able to prove the Section 547(b)(5) element?

Section 547(b)(5) allows the avoidance of a transfer:

> "that enables such creditor to receive more than such creditor would receive if--
> (A) the case were a case under chapter 7 of this title;

13

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5).

*In re Radnor Holdings, Corp.*, 2009 WL 2004226, *2 (Bankr. D. Del. July 9, 2009) ("Courts consistently hold that 'as long as the distribution in bankruptcy is less than 100 percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than [she or] he would have received in liquidation had the payment not been made.'")

*Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del.)*, 320 B.R. 541, 543 (Bankr. D. Del. 2004) (debtor's former Vice President of Merchandise Administration testified that the ultimate distribution to unsecured creditors was expected to be between 6 and 9 percent; court found plaintiff established 547(b)(5)).

*In re M Group*, 308 B.R. 697 (Bankr. D. Del. 2004) (as long as distribution is less than 100%, payment to an unsecured creditor during preference period enables them to receive more than they would in liquidation).

*Ameriserv Food Distribution, Inc. (AFD Fund v. Transmed Foods, Inc.)*, 315 B.R. 24, 29 (Bankr. D. Del. 2004) (§547 (b)(5) element is satisfied based on testimony that the distribution, if any, would be less than 100%).

### 3.    Section 547(c)(4) New Value

Pursuant to Section 547(c)(4) and (g), Defendants also bear the burden of proving that the Preference Transfers are protected from avoidance due to the provision of new value that the Defendants "after such transfer, such creditor gave new value to or for the benefit of the debtor (A) not secured by an otherwise unavoidable security interest and (B) on account of which new

value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

     *Schubert v. Lucent Technologies, Inc. (In re Winstar Communications, Inc.)*, 554 F.3d 382, 2009 (3rd Cir.2009) (the Third Circuit's has reaffirmed the "holding" of the new value standard:

> "This court has held that § 547(c)(4) imposes three requirements: (1) "the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b); "(2) "after receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis;" and (3) "the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition." *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir.1989).")

     *In re First Jersey Sec., Inc.*, 180 F.3d 504, 511 (3rd Cir.1999) (value is deemed given on the date the services are performed, not when the subsequent invoice is issued).

     *In re U.S. Interactive, Inc.et al v. Sampson Travel Agency, Inc., et al*, 321 B.R. 388, 394-5 (Bankr.D.Del. 2005) ("value is deemed given on the date the services are performed", the Court held defendant did not establish when the services were performed and did not meet its burden for the new value defense).

     *TWA Inc. Post Confirmation Estate v. City & County of San Francisco Airports Comm'n (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 221, 228 (Bankr.D.Del.2004) (holding that defendant must prove when the services were rendered to establish that the new value exception applies).

     *Webster v. Harris Corporation (In re Nettel Corporation, Inc., et al.)*, 319 B.R. 290, 295-8 (Bankr.D.D.C.2004) ("new value involving the provision of services is deemed given on the date when the services are rendered"; new value defense basically denied when vendor largely failed to establish the dates when and the value of the services provided).

26.    On August 22, 2008, the Debtor let go of 650 employees and Prudential Location notified their team that Eclipse relocation expenses that occurred after August 22, 2008 are not to be paid. For a few case by case exceptions, they would require an audit, approved by Prudential Client Services, and approval from Eclipse. Therefore, for the Section 547(c)(4) new value defense, Prudential has to prove to a date certain, any asserted services or value provided after August 22, 2008.

27.    Prudential filed a proof of claim on August 11, 2009 in the Debtor's Main Case, listing 131 invoices (the "131 Proof of Claim Invoices") with invoice dates during the Preference Period, totaling $454,425.03, attached hereto as Plaintiff's Exhibit 13.

   a.    Thirty-five of the 131 Proof of Claim invoices, totaling $133,209.68, are dated between August 27 and 29th 2008, before Prudential received a preference period transfer on September 2, 2008, and do not qualify as Section 547(c)(4) new value.  Plaintiff Exhibit 65:

   b.    Of the 131 Proof of Claim Invoices, only 96 invoices, totaling $321,215.35, are dated on or after September 2, 2008 the date of Prudential's receipt of the first Transfer (the "Asserted N.V. Invoices"), attached hereto as Plaintiff's Exhibit 14.

   c.    Sixty (60) of the 96 Asserted N.V. Invoices document that the value of the services provided was during the earlier pre-preference period, before September 2, 2008, and therefore $48,193.76 does not qualify as Section 547(c)(4) new value.  Plaintiff's Exhibit 16.

   d.    Twenty-seven (27) Asserted N.V. Invoices, totaling $103,221.07 do not have dates to detailing the date of the service/value provided.  These

invoices fail to prove the $103,221.07 of services or value provided was after September 2, 2008 and during the Preference Period, and do not qualify as Section 547(c)(4) new value. *See* Plaintiff's Exhibit 20.

28.     Under Section 547(c)(4), Prudential has new value in the amount of $56,057.42 (out of $69,800.52 asserted on the nine invoices), representing substantiated services and value provided after September 2, 2008 and during the Preference Period (the "$56,057.42 Qualified New Value"), as set forth in Plaintiff's Exhibit 21.

    **4.    Section 547(c)(1) contemporaneous exchange of new defense.**

Defendants also bear the burden of proving that the Preference Transfers are protected from avoidance due to the Section 547(c)(1) contemporaneous exchange of new value defense.

    *Batlan v. TransAmerica Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 965 n.4 (9th Cir. 2001)(explaining that § 547(c)(1) "was designed to prevent trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt...").

    *Contempri Homes Inc. (In re Contempri Homes Inc.)*, 269 B.R 124, 128 (M.D. Pa. 2001) ("three requirements must be met. First, the creditor must have extended new value to the debtor. Secondly, the parties must have intended that the new value and the transfer by the debtor be contemporaneous. Finally, the exchange must in fact be a substantially contemporaneous exchange." If a debtor reflects on its remittance advice that the check is in payment of outstanding invoices and not the present shipment, the intention is inferred that the payment is not to be contemporaneous with the new shipment).

    *Jannel Industries Inc. (In re Jannel Industries Inc.)*, 245 B.R. 757, 759 (Bankr. D. Mass. 2000)(applicability of the contemporaneous exchange defense turns on whether the

exchanges were made with the intent required by §547(c)(1)(A)" and the defense is limited to transfers "intended by the debtor and the creditor...to be a contemporaneous exchange for new value given the debtor").

*In re Everlock Fastening Systems, Inc. v. Health Alliance Plan*, 171 B.R. 251, 254-256 (Bankr.E.D.Mi.1994) ("[t]he second element of § 547(c)(1) requires that both ... [parties] intended each exchange to be contemporaneous. To determine the intent of the parties, the court needs to consider whether the agreement or the course of dealings between parties evidenced contemporaneous intent)("[t]he third element of § 547(c)(1) requires that each exchange be substantially contemporaneous. This Court finds that the exchange of money payment for ... services was substantially contemporaneous because the payment for services occurred during the same month the services were provided).

*In re Lewellyn & Co., Inc.*, 929 F.2d 424, 428 (8th Cir.1991) (the inquiry into the parties' intent does not end with an analysis of the written agreement, but includes the consideration of the course of dealings between the parties).

*In re Spada*, 903 F.2d 971, 975 (3rd Cir.1990) (to establish intent, courts have focused on whether there was a manifest desire by the parties that the exchanges contemporaneously granted money or money's worth in new goods, services, credit or property to the debtor).

29.    The Section 547(c)(1) contemporaneous exchange of new defense is not applicable as an affirmative defense for Prudential, as Prudential's Answer to the Plaintiff's Request for Admission No. 14 evidences that Prudential admits they cannot prove the "mutual intent" element of the Section 547(c)(1) defense:

> 14) Admit that Eclipse did not intend that the Transfers during the Preference Period were to be for immediate, simultaneous (i.e. over the counter) exchanges of goods,

services or good will.

**Prudential Response:** "…2) is vague and ambiguous as Prudential could not know of Eclipse's "intentions.""

*See* Plaintiff Exhibit 12.

5.       **Section 547(c)(2) Ordinary Course Defense**

         **(a): Section 547 (c)(2)(A) – ordinary course of business as between the parties**

Pursuant to Section 547(c)(2)(A), (B) and (g), Defendants bear the burden of proving that the Preference Transfers are protected from avoidance as falling within the ordinary course of business affirmative defense.

*Union Bank v. Wolas*, 502 U.S. 151, 160–61, 112 S.Ct. 527, 533 (1991) (first, the goal is to discourage creditors from racing to the courthouse to dismember the debtor on its slide into bankruptcy. "Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.")

*In re Hancock-Nelson Mercantile Company, Inc.*, 122 B.R. 1006, 1012-13 (Bankr. D. Minn. 1991) (for section 547(c)(2) subjective element defendant needs to establish a baseline of dealings, fixed during a time before the debtor became financially distressed; "equality of distribution" and "debtor favoritism" seek to prevent the debtor's "accommodations in payment to those vendors who are most insistent, or whose products or services it deems most vital to its continued operations, and will hold off [paying] the others").

*In re Color Tile, Inc., et al. v. Air Products & Chemicals, Inc., et al.*, 2000 WL 1050580, at *1 (Bankr. D. Del. July 25, 2000) (adopts *Hancock-Nelson* opinion that with respect

19

to 547 (c)(2)(B), the material period "should extend back into the time before the debtor became financially distressed…").

Clark v. Balcor Real Estate Finance, Inc. (In re Meredith Hoffman Partners), 12 F3d 1549, 1556 (10th Cir. 1994) ("One of its primary purposes is to assure equality of distribution according to the statutory scheme.")

Laclede Steel Co. v. Concast Canada, Inc. (In re Laclede Steel Co.), 271 B.R. 127 (8th Cir.BAP (Mo.), 2002) ("reason for the preference provision [is] to ensure that all creditors are treated equally, even during the slide into bankruptcy - the period during which the debtor is unable to cover its obligations").

Camelot Music, Inc. v. MHW Advertising and Public Relations, Inc. (In re CM Holdings, Inc.), 264 B.R. 141, 156 (Bankr. D. Del. 2000) (section 547 strives to prevent "debtors playing favorites among creditors by targeting those creditors to whom it wishes to make payments to the detriment of other creditors.").

Roberds Inc. v. Broyhill Furniture, 315 B.R. 443, 465-67 (Bankr. S.D. Ohio, W. Div., 2004) (the court denied the ordinary course defense when the vendor, who was critical "to any future bankruptcy reorganization plan", was demanding payments prior to further shipments, "the debtor engaged in a more accelerated payment process to assure the overall debt to the [defendant] would be reduced to the smallest possible amount at the time the Debtor filed bankruptcy"… the defendant reduced its account receivable from $1,130,554.13 to $492,591.31, while at the same time the debtor was delaying or denying payments to other creditors and drastically increasing other unsecured creditor claims during the preference period. The court found this was debtor favoritism and inequality of distribution).

20

*Valley Petroleum, LLC v. Garrow Oil Corp.*, 2010 WL 2746989, at *3 (Bankr. E.D. Wis. July 20, 2010) (in determining whether a transaction is outside the parties' "ordinary course of dealings", court is not limited to looking at the creditor's actions, but may also inspect the debtor's actions; "for purposes of preference analysis, who instigated the change [in payment patterns] is irrelevant").

*Craig Oil Co. v. Marathon Oil Company (In re Craig Oil Co.)*, 785 F.2d 1563, 1565-66 (11th.Cir. 1986) (an otherwise normal payment made pursuant to economic pressure and debt collection practices is not within the scope of the ordinary course of business defense; vendor asked for wire transfers, and payments changed from checks to cashier's checks; all payments were made after debtor had stopped purchasing product from vendor; debtor's motive was a factor to consider in analyzing the ordinary course defense).

*Ameriserv Food Distribution, Inc. (AFD Fund v. Transmed Foods, Inc.)*, 315 B.R. 24, 29 (Bankr. D. Del. 2004) (the "diminution of estate doctrine" – did the transfers at issue diminish the funds to which other creditors of the same class could legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one).

*Hechinger Liquidation Trust v. Universal Forest Products, Inc.*, 326 B.R. 282, 285 (Bankr. D. Del. 2005), *aff'd*, 339 B.R. 332 (D. Del. 2006) (creditor's unusual actions to collect the debt and changes in the parties' relationship was a means by which defendant sought to limit its exposure to potential losses; plaintiff recovered preference period transfers).

*Olga L. Bogdanov, Chapter 7 Trustee v. Avnet, Inc. (In re Amherst Technologies, LLC, et al.)*, 2010 WL 3517066 *6, 7 (Bankr.D.N.H. Sept. 3, 2010) (unreported decision) (creditor was pressuring for payments in order to reduce their account receivable exposure, even

though credit terms changed to meet debtor's needs, and debtor made three lump sum payments

of $500,000 each, the bankruptcy court found the actions "almost per se not ordinary").

*J.P. Fyfe v. Bradco Supply Corp.*, 891 F.2d 66, 67-69 (3rd Cir.1989) (the Third

Circuit held three monthly lump sum payments of a payment plan of approximately $130,000 per

month against current deliveries were not "normal, customary business dealings").

*Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (Molded Acoustical Prods.,*

*Inc.),* 18 F.3d 217, 220, 225, 227-8 (3rd Cir. 1994):

> (the Third Circuit used a type of "subjective analysis" for the objective
> industry standard analysis: "[a]lthough our approach in some respects may
> resemble the analyses under §§ 547(c)(2)(A) and (B), we think it imports
> substantial independent significance to § 547(c)(2)(C)." *Id.* at 225).

> (utilizing a type of Section 547(c)(2) subjective element analysis the Third
> Circuit noted "a "payment plan," [is] an act which does not suggest
> business as usual … but … resembles a calculated response to a
> deteriorating creditor-debtor relationship…. Fiber Lite had become ever
> more insistent that the debtor make larger payments as a precondition to
> further shipments of goods; indeed, the debtor despite its insolvency had
> made substantial inroads on its indebtedness to Fiber Lite during that time
> frame"; "debtor had transferred $451,224.64 … during … preference
> period, [but received] only $269,328.04 in new goods").

> ("the preference rule aims to ensure that creditors are treated equitably,
> both by deterring the failing debtor from treating preferentially its most
> obstreperous or demanding creditors in an effort to stave off a hard ride
> into bankruptcy and by discouraging the creditor from racing to
> dismember the debtor." *Id.* at 219.)

> ("a restless Fiber Lite tired of its forbearance and attempted to implement
> a payment plan to catch the debtor up on its late payments…" *Id.* at 222).
> ("§ 547(c)(2), which tersely reveals that " '[t]he purpose of the exception
> is to **leave undisturbed normal financing relations**, because it does not
> detract from the general policy of the preference section to discourage
> unusual action **by either** the debtor or his creditors during the debtor's
> slide into bankruptcy,'" *Id.* at 223).

> ("The preference statute, by allowing the estate to recover in full-for the
> benefit of all the unsecured creditors-assets which a pushy unsecured
> creditor unilaterally plucked for itself or which a fawning debtor used in

an irregular transaction to advantage a favored creditor, seeks to foreclose these tragedy-of-the-common type responses to a struggling business." *Id.* at 223).

("The preference provisions are designed not to disturb normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors." *Id.* at 224).

("[W]e should pause and consider carefully before further impairing a creditor whose **confident, consistent, ordinary extension of trade credit** has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such **continuing relationships on level terms**, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy. *See O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 37 (1st Cir.1984)." *Id.* at 225).

(the ordinary course defense is for "creditors who continue to extend credit within the letter and spirit of the Code." *Id.* at 226).

("… Fiber Lite had become ever more insistent that the debtor make larger payments as a precondition to further shipments of goods…" *Id.* at 228).

("Fiber Lite altered its collection practices within the preference period in several ways besides its extension of the debtor's repayment period: it attempted to institute a "payment plan" and successfully mounted its pressure on the debtor to increase its payments. This evidence indicates to us that Fiber Lite itself did not deem its relationship with the debtor to be normal at that time." *Id.* at 228).

*Florida Steel Corp. v. Stober (In re Industrial Supply Corp.)*, 127 B.R. 62, 64-65 (M.D.Fla.1991), *aff'd* 961 F.2d 1582 (11th Cir.1992) (even though the timing of the payments were consistent with the pre-preference period time lags, payments made as a result of "extraordinary collection efforts" where defendant refused to ship goods unless debtor hand-delivered checks and reduced the level of debt owed to the defendant – were outside the protection of § 547(c)(2)).

23

*Frank v. Volvo Penta of the Americas (In re Thompson Boat Co.)*, 199 B.R. 908, 911-912, 914 (Bankr.E.D.Mich.1996) (even though the timing of the payments were consistent with the pre-preference period, payments made as a result of "extraordinary collection efforts" where defendant refused to ship goods unless debtor made payments to pay down outstanding account receivables, where vendor reduced debtor's credit limit, and net terms, in order to get additional payments – were outside the protection of § 547(c)(2)); "during the preference period, Volvo improved its position and reduced its outstanding exposure by $85,584.68" ... "in a continual decrease of the outstanding credit balance from a high of $241,7426.41 ... to $115,920.22")(while there was payment pressure in the pre-preference period, it increased in the preference period)(the ordinary course of business defense is different and broader than the ordinary business collection practices of a credit manager).

*Brown v. Heigel Lumber & Hardware (In re Mid–South Cabinet & Millwork)*, 125 B.R. 16, 18 (Bankr.E.D.Ark.1990) (an otherwise normal payment made as a result from unusual debt collection practices – a payments made in response to the threat to suspend future credit privileges – was not in the ordinary course of business).

*XTRA, Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 888 F.2d 640 (9th Cir.1989) (the court disallowed the ordinary course of business defense primarily because of the economic pressure exerted by the defendant in obtaining payments from the debtor).

*In re Forklift LP Corporation f/k/a Clark Material Handling Company, et al. v. Custom Tool & MFG. Co.*, 340 B.R. 735, 738-739 (D.Del., March 31, 2006) ("extraordinary collection efforts can bring payment efforts outside the ordinary course of business even when a differing payment interval alone is not enough to do so").

*In re Carni*, 245 B.R. 319, 324 (Bankr. E.D. Wis. 2000) ("payments resulting from economic pressures are not in the ordinary course of business.")

*Montgomery Ward, LLC et al. v. OTC International, Ltd.*, 348 B.R. 662, 664, 667, and 668 (Bankr.Del. 2006) (in granting the ordinary course defense the Court noted the defendant did not engage "in any collection activity", "never refused an order, delayed delivery … [or place[d] a credit limit, … or tie[d] delivery of goods to payment. … did not impose any payment plan … "[t]here were no lump sum payments or payments on account. No payments were handled specially in order to assure delivery of goods".

### (b) Section 547 (c)(2)(B) – ordinary business terms

During the discovery period, Prudential did not identify any expert or employee that would testify on the industry standard, for whom the Plaintiff could forward interrogatories and take their deposition.

Prudential did not respond nor identify an expert or employee witness for the industry standard in response to Plaintiff's Interrogatories Nos. 4, 5, 6, 7, 9, 10, 16, 17, and 21:

> 7)    Identify any employee, former employee or agent of the defendant that you expect to call at trial to testify as an expert witness and issue an opinion on the industry standard. As to each individual, please state the following:
> (a)    a detailed explanation of the subject matter as to which such individual is expected to testify;
> (b)    a detailed explanation of the substance of the facts and opinions to which such individual is expected to testify;
> (c)    a detailed summary of the grounds for each opinion as to which such individual is expected to testify;
>
> Prudential "**OBJECTION:    In addition to the foregoing general objections, which are hereby expressly incorporated, Prudential specifically objects to this interrogatory as premature.**"

*See* Plaintiff Exhibit 12.

25

Prudential has not produced any evidence, documentation, testimony, or expert testimony to show that the Transfers were made according to Section 547(c)(2)(B) "ordinary business terms". Furthermore, Prudential must show detailed, specific evidence as to the industry standard. There is a significant volume of case law providing that a defendant must show detailed, specific evidence as to the industry standard:

*In re U.S. Interactive, Inc.et al v. Sampson Travel Agency, Inc., et al*, 321 B.R. 388, 393 (Bankr.D.Del. 2005) (the Court rejected evidence of an industry standard where the evidence is too general. Instead, courts look for objective, definitive evidence supported by specific data to meet the burden of proof).

*Hechinger Liquidation Trust v. Rager (In re Hechinger Invest. Co. of Del.)*, 298 B.R. 240, 242 (Bankr.D.Del. 2003) (the Court rejects hearsay statements generalizing about the industry standard).

*Harbour v. ABX Enters. (In re APS Holding Corp.)*, 282 B.R. 795, 803 (Bankr.D.Del. 2002) (finding testimony where the witness "guessed" about what would comply with the standard was inconclusive).

*Sacred Heart Hospital of Norristown v. E.B. O'Reilly Serv. Corp. (In re Sacred Heart Hospital of Norristown)*, 200 B.R. 114, 119 (Bankr.E.D.Pa.1996) (rejecting the defense because "the evidence presented by the Defendant was totally lacking in specificity, consisting merely of broad estimates of a wide range of delay time in payments).

*McLaughlin v. Hoole Mach. & Engraving Corp.* (In re Parkline Corp.), 185 B.R. 164, 166 (Bankr.D.N.J. 1994) (holding that the industry norm was established by an expert who presented percentages of the industry making late payments).

*In re SGSM Acquisition Con., LLC*, 439 F.3d 233 (5th Cir. 2006) (rejecting testimony from individuals for lack of expert knowledge, relevant evidence of the industry standard should include the testimony of disinterested experts not employed by the creditor). *See also 5 Collier on Bankruptcy* ¶ 504.04[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

*In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 224, 227 (3rd Cir. 1994) (the testimony of directors or insiders has been disregarded when establishing the relevant industry standard; and "ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships"):

> ("We think ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships. *See In re Hoffman*, 12 F.3d at 1553 ("Ordinary business terms ... are those used in 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when the debtors are healthy."). *Id.* at 227).

> ("the court stressed that Fiber Lite's "industry terms" evidence, which consisted solely of its separate dealings with one other company and that company's wholly-owned subsidiary, constituted evidence of its dealings with but a single entity other than the debtor, and, consequently, was as a matter of law insufficient evidence to establish an industry standard." *Id.* at 221).

> ("in light of Fiber Lite's failure to introduce any evidence as to industry standards save for its president's testimony as to its own collection practices with another delinquent customer and its subsidiary, it had failed to establish an industry standard..." *Id.* at 221).

> ("to verify that the creditor is not *226 exploiting the debtor's precarious position at the brink of bankruptcy so that it may advantage itself to the detriment of other creditors who continue to extend credit within the letter and spirit of the Code, or at the very least to verify that the creditor is refraining from "unusual" action to collect ordinary debts." *Id.* at 225-6).

> ("That is to say, the parties' longstanding credit terms, although consistent as between them, may depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors." *Id.* at 226).

27

("it might appear that the creditor is simply trying to accommodate the debtor's precarious financial condition or to strike itself a superior deal at the expense of a frail debtor, causing the transfer to lose its flavor of normalcy. That such an appearance of impropriety alone will suffice to invalidate a transfer we think is a decision Congress reached, and one that we will not question." *Id.* at 226).

*In re Erie County Plastics, Corp.,* 438 B.R. 89, 92 (Bankr. W.D. Pa. 2010) (court noted that in order to determine if "ordinary business terms" were in existence, Third Circuit requires a "healthy not moribund" standard, as opposed to a determination of whether terms were ordinary for that industry in situations of financial distress).

*In re Quad Systems Corporation,* 2003 WL 25947345, at *12 (Bankr. E.D. Pa. July 15, 2003) ("the defendant must provide some evidence as to what practices are generally adhered to by financially healthy members of the relevant industry").

*In re Allegheny Health,* 292 B.R. 68, 89 (Bankr. W.D. Pa. April 17, 2003) (citing *Molded Acoustical,* court rejected defendant's use of payment information for moribund clients as "only terms that are ordinary constitute an industry's norms, and 'ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships.'")

Prudential has not submitted any expert reports throughout the discovery process, nor identified their employee witness during the time discovery was open, which did not allow the Plaintiff to take discovery – interrogatories or deposition of the Late Identified Employee Witness for the Industry Standard. The time for discovery has now closed. Prudential did not identify any experts that it intended to testify at trial. Nor has Prudential established the relevant industry standard to be applied. Thus, Prudential cannot prove that payment was made according to ordinary business terms.

28

**Factual Pattern for Section 547(c)(2)(A) and/or (B).**

30.     The Section 547(c)(2)(A) or (B) defense, is not applicable and not available to Prudential as an affirmative defense to protect the Transfers from avoidance supported by as the facts stated below:

31.     On August 22, 2008, five days before the Preference Period, the Debtor let go of 650 employees.   On August 28, 2008, Prudential notified their team that Eclipse relocation expenses that occurred after August 22, 2008 were not to be paid.   For a few case by case exceptions Prudential required an audit, approval by Prudential Client Services, and approval from Eclipse. *See* Plaintiff's Exhibit 23.

32.     On August 28, 2008, the second day of the Preference Period, Renee Williams-Verner of Prudential emailed Kimberly Clare of Prudential and informed her that Eclipse was placed in "billing review" and an "escalation process" for payments and contacted Eclipse. *See* Plaintiff's Exhibit 23.

33.     On September 2, 2008, Prudential internal emails noted Eclipse's statement that Eclipse was conserving cash and would pay pursuant to a $50,000 per week payment plan. *See* Plaintiff's Exhibit 23.

34.     On September 3, 2008, a Prudential internal email noted that Eclipse:

> "... They are in financial instability and I am very concerned about our exposure.
> "Eclipse currently has $799,798.09 in Account Receivables plus $144,599.07 unbilled for the past week....
> "They plan to pay us $50,000 per week....
> "... It is a touch relationship issue and could set off issues if we demand more.

*See* Plaintiff's Exhibit 23.

35.     On September 8, 2008, a Prudential internal email stated:

> "Eclipse is under "billing review, no payments are going out unless they are audited and approved by Client Services.... on this unstable account....

*See* Plaintiff's Exhibit 23.

36.    The first five weekly Preference Transfers, were the first checks conforming to the $50,000 per week payment plan, and paid aged invoices. *See* Plaintiff's Exhibits 2c, 24-28.

37.    The last seven (7) transfers, starting October 1, 2008 through November 20, 2008, were all approximately $75,000 conforming to a second Prudential forced payment plan during the Preference Period.

38.    Prudential, in emails dated September 12, 22, 24, and 26 2008, contemplated sending Eclipse an "ultimatum" for "$954k in receivables", an "A-bomb", also requesting an increase in weekly payments from $50,000 to $75,000, and having Eclipse no longer pay "aged invoices" but now all "current invoices", and noted "our only leverage is to stop servicing their account". *See* Plaintiff Exhibits 36 and 37.

39.    In a September 24, 2008 email, Prudential requests an increase in the payments from $50,000 to $75,000 per week and to pay current invoices. *See* Plaintiff's Exhibit 36.

40.    After no response from Eclipse, on September 26, 2008, Prudential emails Eclipse again regarding the new plan. See Plaintiff's Exhibit 38.

41.    In an email dated September 30, 2008, Prudential demands a response by tomorrow of $75,000 per week paying current invoices, or Prudential will review termination of services. *See* Plaintiff's Exhibit 38.

42.    Andrew Kamm, V.P. of Eclipse in an email responded on September 30, 2008:

> "... I am planning to pay $75k per week... $75k will go out tomorrow, paying the newest invoices that we have in our AP system".

*See* Plaintiff's Exhibit 38, PR-E 04323.

43.     Another change in the parties payment relationship during the Preference Period
was the approximate $75,000 weekly payment plan amount changed from checks to wire
transfers: the final three weekly payments during the Preference Period were wire transfers of
approximately $75,000 on October 30; November 6 and November 20, 2008, the tenth, eleventh,
and twelfth Transfers. *See* Plaintiff Exhibits 33, 34, 35, 4 and 6.

44.     During the Preference Period, the Transfers went from paying "Aged Invoices"
(first five Transfers) to "Current Invoices (Transfers 6, 7, and 8) to the third type of payment
plan for the last four Transfers regarding Post-Dated Invoices and "Weekly Billing Lists" of
approximately $75,000 per week.

45.     For the last four transfers, starting with the October 22, 2008 transfer (the last
check), Prudential was sending Eclipse "Weekly Billing Lists" (dated October 21, October 27,
November 3, and November 10, 2008) of project numbers of services already performed, aka
antecedent debt, to be paid, but not yet invoiced. *See* Plaintiff Exhibits 32, 33, 34, 35.

46.     For the last four Transfers that paid Weekly Billing Lists, Eclipse's Excel
Spreadsheet Payment History did not list the actual invoice date or invoice number (i.e. 6215525,
Hernandez invoice, dated Nov. 7), but listed instead the date of the Weekly Billing List, and the
project number from the Weekly Billing List (i.e. 3427581). After a Transfer, when Eclipse later
received a "real" post-dated invoice with actual invoice numbers (the "Post-Dated Invoices"),
Eclipse did not revise their Excel Spreadsheet Payment History by inserting the correct invoice
date or invoice number. *See* Plaintiff Exhibits 2a, 2c, 32, 33, 34, and 35.

47.     After receiving a $75,000 preference Transfer paying a Weekly Billing List of
services, Prudential then issued Post-Dated Invoices.   For example, Prudential sent Eclipse an
October 27, 2008 Weekly Billing List of approximately 30 project numbers/invoices reflecting

services that had already been performed. When Eclipse paid the list on October 30, 2008, Eclipse noted all 30 invoice dates as October 27, (the date of the Weekly Billing List). When Prudential sent the "real" invoices, with "real" invoice numbers, the Post-Dated invoice dates were dated November 7, 2008, but the actual services provided were from months earlier. *See* Plaintiff Exhibit 39.

48.    The Weekly Billing List payment arrangement allowed Prudential to receive the weekly $75,000 Transfer and Eclipse could not object to any invoice information or errors until after Prudential had the payment in hand, an internal Prudential email states:

> "Kim, Maureen and Janna have brought me into the loop on the questions Eclipse is having in regards to the spreadsheet received below. My understanding in working with Eclipse on a cash basis, is we would prepare what was ready to be billed and forward to them so they could advance the $75,000 to us. Once the payment was received, the invoices would be pushed through and the funds applied. **At that time, since a "real" invoice had been created, Eclipse could then dispute any charges, after the fact. They cannot dispute the spreadsheet.** If this is going to be the case, we will need to re-visit the current arrangement with legal. I cannot hold up this process. Rene"

*See* Plaintiff Exhibit 40, PR-E04445-47, [emphasis supplied].

49.    Nearly one month before the Petition Date of November 25, 2008, Eclipse basically stopped writing checks and greatly curtailed making payments to its vendors, and switched to making a few wire transfers to select vendors. *See* Plaintiff Exhibit 4.

50.    The 10th Transfer to Prudential, dated October 30, 2008, in the amount of $74,718.23, was the first time in their entire relationship Eclipse paid Prudential with a wire transfer (the "October 30 Wire"). The October 30 Wire was from Eclipse's Operating Account. *See* Plaintiff Exhibit 4.

51.    Eclipse issued only 3 checks and no wires in November 2008 from the Operating Account; and approximately 34 wire transfers to employees and vendors, and 108 checks to

employees, garnishment checks, taxing authorities, and vendors in November 2008 from the Employee Payroll Account. Plaintiff Exhibits 5 and 6.

52.    Eclipse's main Operating Account, only had three small checks clear in November, 2008 and no wires to vendors. *See* Plaintiff Exhibit 5.

53.    The 11th and 12th Transfers to Prudential, a $76,179.85 wire on November 6 and a $74,979.10 wire on November 20, 2008 were not from the Operating Account, but rather were from Eclipse's Employee Payroll Account. *See* Plaintiff Exhibit 6.

**6.    The Plaintiff's right to pre-judgment interest from the date of the Transfers.**

The Trustee is entitled to an award of 6% pre-judgment interest on the Transfers from the date of the Transfers.

The Third Circuit has stated that the award of prejudgment interest is within the discretion of the bankruptcy court, however, ""[d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so." *See Hechinger Investment v. Universal Forest Products (In re Hechinger)*, 489 F.3d 568, 580-81 (3rd Cir. 2007)(internal citations omitted).

*Hechinger Investment Co. of De., Inc. v. Universal Forest products, Inc.,* 489 F.3d 568, 580 (3rd Cir. 2007) (prejudgment interest is to be awarded in preference actions unless there is a sound reason not to do so).

*Burtch v. Masiz, et al. (In re Vaso Active Pharmaceuticals, Inc.),* 2012 WL 4793241 *23, 24 (Bank.D.Del.) and Adv. Pro. No. 11-52005 D.I. 59 (the Court in 2012 awarded prejudgment interest of six (6%) per cent per annum from the date of the transfers).

33

*In the Matter of Milwaukee Cheese Wisconsin, Inc.,* 112 F.3d 845, 849 (7th Cir. 1997) (prejudgment interest is to be awarded on a preference recovery unless there is a sound reason not to do so, it is "an ingredient of full compensation").

*In re Amherst Technologies, LLC,* 2010 WL 3517066, at *11 (Bankr. D. N.H. Sept. 3, 2010) (even though the defendants established affirmative defenses that limited the trustee's preference recovery, court still awarded prejudgment interest from the date the complaint was filed to "help make the estate 'whole'").

*Kelley v. Chevy Chase Bank (In re Smith),* 236 B.R. 91, 103 - 04 (Bankr. M.D. Ga 1999) (prejudgment interest is awarded in preference actions to prevent unjust enrichment of preferred creditor; to eliminate incentive to prolong litigation; to restore estate to full value of preference; and to compensate debtor for loss of preference).

*In re Nathan and Miriam Barnert Memorial Hospital Assoc. v. Onward Healthcare, Inc.,* 2009 WL 3230789, *11 (Bankr. D.N.J. Oct. 5, 2009) ("Most courts have therefore found that awarding prejudgment interest in a preference action furthers the congressional policies of the Bankruptcy Code.")

## VI.    DEFENDANT'S SECTION OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED.

### 1.    Section 547 (c)(2)(B) – Ordinary Course of Business as Between the Parties

Payments by Eclipse that Prudential received during the Preference Period are subject to the ordinary course of business exception.  Therefore, Eclipse is not entitled to a preference for any of the payments set forth in its Complaint. "In determining whether payments were made in the ordinary course of the parties' dealings, courts consider such factors as: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner

different from previous payments; (4) whether there appears to be an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.") *In re Global Tissue, L.L.C.*, 302 B.R. 808, 812 (D. Del. 2003)

All of these factors support Prudential's assertion of the ordinary course of dealing defense. For over three-years, Prudential provided relocation services to Eclipse. The payment history remained consistent throughout the business relationship. Eclipse routinely paid multiple invoices with a single payment. The payments made during the Preference Period were of similar amounts to those paid throughout the parties' business dealings. All payments were made by check, with the exception of the last three preference payments made by wire transfer. Courts have held that this change does not take payments out of the ordinary course. *In the Matter of: Brown Transport Truckload, Inc.*, 161 B.R. 735, 740 (N.D. Ga. 1993) ("simple changes in the method of payment . . . are not enough to make the business relationship not ordinary. More drastic changes must be effected before payments are considered not to be ordinary); *In re: American Camshaft Specialties, Inc.*, 44 B.R. 347 (E.D. Mich. 2011) (same).

Perhaps most importantly, the timing of Eclipse's payment of invoices during the Preference Period remained similar Prudential intends to introduce a preference analysis comparing the Preference Period with the twenty-one months prior to the Preference Period (the "Pre-Preference Period") that will reflect a statistically insignificant difference in the timing of Eclipse's payments . . Courts have noted that a small difference does not render such payments as falling outside of the ordinary course exception. *In re Global Tissue, L.L.C.*, 302 B.R. 808, 812 (D. Del. March 28, 2003) ("[i]n this case, sufficient evidence was presented to show that although the Debtors made their payments a bit faster during the preference period than during

the pre-preference period, the payment rate was still within the normal range of the parties'
dealings); *see also McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corporation)*, 185 B.R.
103, 113 (Bankr. E.D.N.Y. 1995) (holding that courts should be "mindful of the fact that
absolute consistency in actual or average payment dates is unrealistic and not required"); *Marlow
v. Federal Compress & Warehouse Company, Inc. (In re Julien Company)*, 157 B.R. 834, 837
(Bankr. W.D. Tenn. 1993) (noting that preference payments need not conform exactly to the pre-
preference period payments as long as there is "*some consistency* with other business
transactions between the debtor and the creditor.") (emphasis in original).

        The Trustee's primary attack on Prudential's use of the ordinary course of business
defense is its claim that Prudential accepted "lump sum" payments during the Preference Period.
First, Eclipse never paid and Prudential never accepted "lump sum" payments. All payments
received throughout the parties' entire history were exact payments for multiple invoices. While
it is true that Prudential sought minimum payments of $50,000 (and later $75,000) during the
Preference Period, it made similar demands during the Pre-Preference period. Specifically, in
late 2007, Prudential demanded that Eclipse make $200,000 minimum payments. Eclipse made
payments in excess of $200,000 after this demand.

        In short, any allegations by the Trustee that Prudential "pressured" Eclipse into making
the subject Transfers is no absolutely no significance since it similarly "pressured" since
Prudential's conduct in seeking payments was consistent, and thus within the "ordinary course"
of the parties' relationship. *In re Global Tissue, L.L.C.*, 302 B.R. 808, 813 (D. Del. 2003)
(holding that contacting customers about outstanding invoices was a "normal and common
business practice" in the ordinary course of business), *aff'd* 106 Fed. Appx. 99, 102-03 (3d Cir.
2004); *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 245 (Bankr. D.

36

Del. 2010) (finding that transfers were made in the ordinary course of business even though trustee alleged that defendant "pressured the Debtors into payment during the Preference Period by requiring payments on past due invoices before shipment of new goods were made, by requiring the Debtors to pay down its outstanding balance during the Preference Period, by informing the Debtors that expedited payment would result in expedited shipment of goods, and by sending the Debtors a list of past due payments" because *such practices were "consistent with the historical dealings between the Debtors and the Defendant"); Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 112 (Bankr. D. Del. 2010) (applying the ordinary course of business exception where trustee argued that the defendant "threatened to withhold future shipments from Debtors and that this conduct elevates to 'unusual collection activity'" because *throughout the parties' relationship "Defendant customarily called several times to collect unpaid invoices and threatened to withhold shipment."); Troisio v. E.B. Eddy Forest Products Ltd. (In re Global Tissue, L.L.C.)*, 302 B.R. 808, 813 (D. Del. 2003) (holding that contacting customers about outstanding invoices was a "normal and common business practice" in the ordinary course of business), *aff'd* 106 Fed. Appx. 99, 102-03 (3d Cir. 2004); *Brothers Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Brothers Gourmet Coffees, Inc.)*, 271 B.R. 456, 461 (Bankr. D. Del. 2002) ("the record shows nothing unusual about the course of business between the parties in the preference period as compared with the prior three years"); *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corporation)*, 185 B.R. 103, 113 (Bankr. E.D.N.Y. 1995) (holding that courts should be "mindful of the fact that absolute consistency in actual or average payment dates is unrealistic and not required").

## 2.    Section 547 (c)(2)(B) – Ordinary Business Terms

Prudential's Director of Accounting intends to testify that the subject Transfers were made according to ordinary business terms, which are within the industry standard. Strict conformance to industry standard is not a prerequisite for proof.   Also contrary to the Trustee's assertions, employee testimony (and not expert testimony) can sufficiently establish the ordinary business terms exception.

*In re Global Tissue L.L.C.*, 302 B.R. 808, 813 (D. Del. 2003) (declining to accept trustee's argument that a creditor "must come forward with particularized evidence in the industry which is much broader than its own practices.");

*Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 309 (Bankr. D. Del. 2010) (noting that testimony from employees of the parties involved in a preference payment dispute may be used to establish industry standard);

*In re Cherrydale Farms, Inc.*, 2001 Bankr. LEXIS 156, at *14 (Bankr. D. Del. Feb. 20, 2001) (same);

*McLaughlin v. Hoole Machine and Engraving Corp. (In re Parkline Corp.)*, 185 B.R. 164, 170 (D. N.J. 1994) ("The Third Circuit . . . tempered the necessity of showing strict conformance with the industry standard by deeming the duration of the relationship between the parties to be particularly relevant.");

*In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (showing "ordinary business terms" in the industry "does not mean that the creditor must establish the existence of some single, uniform set of business terms . . .").

### 3.    Section 547(c)(4) - New Value

Prudential also asserts a new value defense pursuant to 11 U.S.C. § 547(c)(4). There is no dispute that throughout the preference period, Prudential "gave new value to or for the benefit of [Eclipse]" and that such benefit is "not secured by an otherwise unavoidable security interest." 11 U.S.C. § 547(c)(4)(A).    Furthermore, new value occurred after the last transfer provided by Prudential and thus the new value is "on account of which . . .the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4)(B).

As of the Petition Date, Eclipse was indebted to Prudential in the amount of $905,773.47 On August 11, 2009, Prudential filed its Proof of Claim in that amount, which included an itemized statement of the unpaid prepetition balance due Prudential.    By comparing the preference period transfers set forth in Eclipse's complaint with the pre-petition invoices with an invoice date beginning after the first preference period payment, Prudential has determined the new value to total **$331,178.10.**    This amount was discounted by any applicable pre-petition invoices that provided credits to Eclipse and did not include invoices that constituted interest or late charges.

The Trustee challenges this analysis by asserting that Prudential must establish when the services were provided and claims that the amount of new value that Prudential can establish using this approach is **$56,057.42.**    To the contrary, Prudential expects that it will introduce evidence establishing services rendered during the Preference Period that will result in new value of **$128,379.40.**

## VII.    **PREMARKED EXHIBIT LIST**

**Plaintiff**

1.      Exhibit 1: Complaint Prudential Real Estate and Relocation Services, Inc.

2.      Exhibit 2a:  Exhibit A of Complaint, Prudential Check & Wire Transactions with Invoice History.
> Exhibit 2.b: Prudential Check & Wire Transactions, (AE/Prud000001-2).
> Exhibit 2.c: Prudential Invoice History, (AE/Prud000012-141).

3.      Exhibit 3: Prudential Copies of Checks. (AE/Prud000003-11).

4.      Exhibit 4: Bank Statement, (Account No. 135-0952788 (the "Operating Account") Bank Statement October 1-31, 2008, (AE000170-185, or AETrusteeDisc000142-157, 148).

5.      Exhibit 5: Operating Account Bank Statement, (Account No. 135-0952788), November 1-30, 2008, (AE000186-188, or AETrusteeDisc000172-174).

6.      Exhibit 6: Payroll Bank Statement, (Account No. 4121435101) (the "Employee Payroll Account") dated November 20, 2008, (Trustee mistakenly used previously used bates stamp numbers, this is a duplicate number, but a different document, AE/Prud000142-191).

7.      Exhibit 7: Prudential Answer, filed February 7, 2011 [D.I. 4].

8.      Exhibit 8: Prudential Discovery Requests served March 31, 2011.

9.      Exhibit 9: Trustee Discovery Response filed June 8, 2011, which included AE000001 - AE002587 (aka AETrusteeDisc000001-002598) and AE/Prud000001 - AE/Prud000142, (the "Plaintiff's Discovery Responses") [D.I. 16].

10.     Exhibit 10: Trustee email, dated August 8, 2012, re Supplemental Production, AETrusteeDisc002599 - 5034 and AE/Prud000142 – AE/Prud001556, [D.I. 20], and on August 8, 2012, the Plaintiff via email informally supplemented his production of documents, AE/Prud000142-191.

11.     Exhibit 11: Plaintiff's Discovery Request, served April 20, 2011.

12.     Exhibit 12: Prudential Discovery Responses served July 5, 2011.   PR-E  00001-04310.   On or about August 22, 2011, Prudential informally supplemented their production of documents, PR-E 04311-PR-E 04559, ("Prudential's Supplemental Production"), [not docketed].

13.     Exhibit 13: Prudential Contract and Proof of Claim.

14.    Exhibit 14: 96 Invoices asserted as new value, in order of Proof of Claim of List, (PR-E 00440-7, AE/Prud000372, AE/Prud000387, AE/Prud000386, AE/Prud000373, AE/Prud000385, AE/Prud000374, AE/Prud000384, AE/Prud000383, PR-E 00457, AE/Prud000375-6, AE/Prud000382, AE/Prud000381, AE/Prud000380, AE/Prud000377, AE/Prud000379, AE/Prud000354, AE/Prud000378, PR-E 00467, AE/Prud000355-7, AE/Prud000370, AE/Prud000389, AE/Prud000371, AE/Prud000391, AE/Prud000368, AE/Prud000358, AE/Prud000367, AE/Prud000359, AE/Prud000388, AE/Prud000360, AE/Prud000390, AE/Prud000366, AE/Prud000364, AE/Prud000361, AE/Prud000363, AE/Prud000365, AE/Prud000369, AE/Prud000291-2, PR-E 00490, AE/Prud000155, AE/Prud000341, AE/Prud000300-2, AE/Prud000345, AE/Prud000299, AE/Prud000348, AE/Prud000347, AE/Prud000344, AE/Prud000343, AE/Prud000342, AE/Prud000312, AE/Prud000304, AE/Prud000313, AE/Prud000340, AE/Prud000339, AE/Prud000303, AE/Prud000307-11,      AE/Prud000305-6,      AE/Prud000296,      AE/Prud000289, AE/Prud000314, AE/Prud000290, AE/Prud000351, AE/Prud000350, AE/Prud000297, AE/Prud000352, AE/Prud000294, AE/Prud000353, AE/Prud000295, AE/Prud000349, AE/Prud000298, AE/Prud000337, AE/Prud000346, AE/Prud000398, AE/Prud000338, AE/Prud000293, PR-E00534-6).

15.    Exhibit 15: Trustee New Value Chart of Prudential Invoices on Exhibits 14, 16-21.

16.    Exhibit 16: No N.V. Invoices by Dates, (PR-E 00440, PR-E 00444, PR-E 00446-7, AE/Prud000373, AE/Prud000385, AE/Prud000374, AE/Prud000384, AE/Prud000375-6, AE/Prud000382, AE/Prud000381, AE/Prud000377, AE/Prud000354, AE/Prud000378, PR-E 00467, AE/Prud000355, AE/Prud000357, AE/Prud000370, AE/Prud000389, AE/Prud000371, AE/Prud000391, AE/Prud000368, AE/Prud000358, AE/Prud000367, AE/Prud000359, AE/Prud000388, AE/Prud000360, AE/Prud000390, AE/Prud000366, AE/Prud000364, AE/Prud000361, AE/Prud000363, AE/Prud000365, AE/Prud000369, AE/Prud000291, PR-E 00490, AE/Prud000155, AE/Prud000302, AE/Prud000345, AE/Prud000299, AE/Prud000347, AE/Prud000344, AE/Prud000312, AE/Prud000340, AE/Prud000308, AE/Prud000305-6, AE/Prud000296, AE/Prud000314, AE/Prud000351, AE/Prud000350, AE/Prud000297, AE/Prud000295, AE/Prud000349, AE/Prud000298, AE/Prud000398, PR-E00534-6).

17.    Exhibit 17: August 2008 Interest Charge List, (AE/Prud000155-160).

18.    Exhibit 18: September 2008 Interest Charge List, (AE/Prud000144-154).

19.    Exhibit 19: Account Receivable List 09-19-08, (PR-E 04435-04443).

20.    Exhibit 20: Questionable NV invoices, no dates, (PR-E 00441-3, PR-E 00445, AE/Prud000387, AE/Prud000386, AE/Prud000383, AE/Prud000380, AE/Prud000379, AE/Prud000341, AE/Prud000300, AE/Prud000348, AE/Prud000343, AE/Prud000342, AE/Prud000313, AE/Prud000339, AE/Prud000303, AE/Prud000307, AE/Prud000309-10,    AE/Prud000289-90,    AE/Prud000352-3,    AE/Prud000337,    AE/Prud000346, AE/Prud000293).

21.    Exhibit 21: Qualified New Value Invoices, (AE/Prud000372, PR-E 00457, AE/Prud000356, AE/Prud000292, AE/Prud000301, AE/Prud000304, AE/Prud000311, AE/Prud000294, AE/Prud000338).

22.    Exhibit 22: September 5, 2008 Prudential Email on cancellation fees, (PR-E 04333).

23.    Exhibit 23: Prudential Emails, (PR-E 04403-04423).

24.    Exhibit 24: Check No. 56817, dated 08-27-08, and invoices paid, (AE/Prud000003, AE/Prud000800, AE/Prud000799, AE/Prud000801, AE/Prud000926, AE/Prud000924, AE/Prud000928, AE/Prud000929, AE/Prud000930, AE/Prud000931, AE/Prud000927, AE/Prud000934, AE/Prud000933, AE/Prud000932, AE/Prud000935, AE/Prud000936, AE/Prud000937, AE/Prud000920, AE/Prud000922, AE/Prud000921, AE/Prud000768, AE/Prud000769, AE/Prud000771, AE/Prud000773, AE/Prud000775-AE/Prud000781, AE/Prud000770, AE/Prud000772, and AE/Prud000774).

25.    Exhibit 25: Check No. 56973, dated 09-03-08, and invoices paid, (PR-E 01842, PR-E 01843, PR-E 01944, PR-E 01845, PR-E 01846, AE/Prud000795, AE/Prud000796, AE/Prud000782 - AE/Prud000788, AE/Prud000798, AE/Prud000789, AE/Prud000598, AE/Prud000731, AE/Prud000790, AE/Prud000791, AE/Prud000792, AE/Prud000797, AE/Prud000793, AE/Prud000794, AE/Prud000659, AE/Prud000656, AE/Prud000667, AE/Prud000668, AE/Prud000666, AE/Prud000655, AE/Prud000666, AE/Prud000664, AE/Prud000653, AE/Prud000662, AE/Prud000663, AE/Prud000660, AE/Prud000652, AE/Prud000669, AE/Prud000638, AE/Prud000658, AE/Prud000657, AE/Prud000639, AE/Prud000654,        AE/Prud000640,        AE/Prud000595,        AE/Prud000596,        and AE/Prud000597).

26.    Exhibit 26: Check No. 57127, dated 09-10-08, and invoices paid, (PR-E 01882, AE/Prud000661, PR-E 01884, PR-E 01885, AE/Prud000706, AE/Prud000701, AE/Prud000700, AE/Prud000685, AE/Prud000684, AE/Prud000682, AE/Prud000681, AE/Prud000698, PR-E 01895, PR-E 01896, PR-E 01897, AE/Prud000713, AE/Prud000705, AE/Prud000704, AE/Prud000703, AE/Prud000702, AE/Prud000707, AE/Prud000683, AE/Prud000708, AE/Prud000680, PR-E 01907, AE/Prud000699, AE/Prud000709, AE/Prud000697, AE/Prud000696, AE/Prud000695, PR-E 01913, AE/Prud000710, AE/Prud000711, PR-E 01916, AE/Prud000712, and AE/Prud000714).

27.    Exhibit 27: Check No. 57301, dated 09-17-08, and invoices paid, (AE/Prud000761, AE/Prud000694, AE/Prud000762, AE/Prud000763, AE/Prud000764, AE/Prud000765, AE/Prud000690, AE/Prud000691, AE/Prud000687, ·AE/Prud000766, AE/Prud000767, AE/Prud000757, AE/Prud000759, AE/Prud000760, AE/Prud000758, AE/Prud000693, AE/Prud000692, AE/Prud000689, AE/Prud000686, AE/Prud000688, AE/Prud000752, AE/Prud000751, AE/Prud000746, AE/Prud000756, AE/Prud000755, AE/Prud000754 and AE/Prud000753).

28.    Exhibit 28: Check No. 57436, dated 09-24-08, and invoices paid, (AE/Prud000733, AE/Prud000729, AE/Prud000736, AE/Prud000734, AE/Prud000735, AE/Prud000737, AE/Prud000745, AE/Prud000750, AE/Prud000749, AE/Prud000747, AE/Prud000748, AE/Prud000740, AE/Prud000741and AE/Prud000738).

29.    Exhibit 29:    Check No. 57579, dated 10-01-08, and invoices paid, (AE/Prud000008, AE/Prud000477, AE/Prud000485, AE/Prud000498, AE/Prud000476, AE/Prud000475, AE/Prud000474, AE/Prud000484, AE/Prud000473, AE/Prud000483, AE/Prud000472, AE/Prud000482, AE/Prud000497, AE/Prud000496, AE/Prud000495, AE/Prud000494, AE/Prud000481, AE/Prud000480, AE/Prud000493, AE/Prud000492, AE/Prud000479, AE/Prud000478, AE/Prud000490, AE/Prud000489, AE/Prud000500, AE/Prud000488, AE/Prud000499, AE/Prud000491).

30.    Exhibit 30: Check No. 57710, dated 10-08-08, and invoices paid, (AE/Prud000009, PR-E 02039, AE/Prud000433, AE/Prud000436, AE/Prud000437, PR-E 01994,    AE/Prud000430,    AE/Prud000432,    AE/Prud000431,    AE/Prud000435, AE/Prud000428, AE/Prud000429, AE/Prud000438, AE/Prud000439, PR-E 02003, AE/Prud000440, AE/Prud000441, PR-E 02006, PR-E 02007, AE/Prud000401, AE/Prud000402, AE/Prud000403, AE/Prud000453, AE/Prud000406, AE/Prud000405, AE/Prud000404, AE/Prud000452, AE/Prud000412, AE/Prud000411, AE/Prud000410, AE/Prud000409, AE/Prud000408, AE/Prud000407, AE/Prud000413, AE/Prud000414, AE/Prud000415, AE/Prud000416, AE/Prud000417, AE/Prud000418, AE/Prud000419, AE/Prud000420, AE/Prud000449, AE/Prud000448, AE/Prud000422, AE/Prud000423, AE/Prud000424, AE/Prud000425, AE/Prud000426, AE/Prud000427, AE/Prud000443, AE/Prud000444,    AE/Prud000445,    AE/Prud000446,    AE/Prud000447    and AE/Prud000421).

31.    Exhibit 31: Check No. 57858, dated 10-15-08, and invoices, (AE/Prud000010, PR-E 02046, PR-E 02047, PR-E 02048, AE/Prud000486, PR-E 02050, PR-E 02051, PR-E 02052, PR-E 02053, PR-E 02054, PR-E 02055, PR-E 02056, PR-E 02057, AE/Prud000487, PR-E 02059 - PR-E 02065, AE/Prud000504, AE/Prud000503, AE/Prud000502, AE/Prud000501, AE/Prud000458, AE/Prud000456, AE/Prud000471, AE/Prud000470, AE/Prud000469, AE/Prud000468, AE/Prud000467, AE/Prud000466, AE/Prud000465, AE/Prud000464, AE/Prud000457, AE/Prud000463, AE/Prud000462, AE/Prud000461, AE/Prud000460, AE/Prud000459, AE/Prud000434, AE/Prud000450, AE/Prud000451, AE/Prud000455 and AE/Prud000454).

32.    Exhibit 32: Check No. 58049, dated 10-22-08, Weekly Billing List and Post-Dated Invoices, (AE/Prud000011, AE/Prud000229 - AE/Prud000288). Weekly Billing List 10/21/08, of 65 projects totaling $73,658.61, check 10/22/08 paid 64 project numbers totaling $74,907.61, invoices all dated 10/31/08, while on the Exhibit 2 Eclipse excel spreadsheet, the invoices are listed by project numbers and dated 10/21/08. The "real" invoices indicate services from Nov. 2007, June, July, Aug, Sept, and Oct. 2008.

33.    Exhibit 33: 10-30-08 Wire, Weekly Billing List 10-27-08, and Post-Dated Invoices, (AE/Prud000192 – AE/Prud000228).   Weekly Billing for 10/27/08, totals

$74,718.23, exact amount paid by wire on October 30, 2008. *See* PR-E04445-7; *see also* PR-E04448-50.  On Exhibit 2 Excel spreadsheet invoices are listed by project numbers and dated October 27, 2008.  Actual invoices at AE/Prud000192-228 are dated November 7, 2008, when they were paid by October 30, 2008 wire.

34.    Exhibit 34: 11-06-08 Wire, Weekly Billing List 11-03-08, and Post-Dated Invoices (AE/Prud000179 – AE/Prud000191).  Weekly Billing List 11/03/2008 totals $74,930.85, paid by the 11/06/08 wire of $76,179.85.  The wire was Nov. 6, all 14 invoices are dated November 14, 2008, but most invoices indicate dates of service from July – Oct.   The Exhibit 2 Excel Spreadsheet Payment History lists not invoice numbers but project numbers, and has dates of invoice 10/27/08 or 11/03/08, post-dated invoices are 11-14-08, and services are months old.

35.    Exhibit 35: 11-20-08 Wire, Weekly Billing List 11-10-08, and Post-Dated Invoices (AE/Prud000315 – AE/Prud000336).  Weekly Billing List 11/10/08 for $74,979.10. *See* PR-E04473.  Wire transfer on 11/20/08 paid exactly that amount.  20 invoices all dated 12-12-08, Post-petition.  On Exhibit 2 Excel Spreadsheet Payment History, invoices are listed by project numbers, and dated 11/10/08.  Actual invoices indicate services for Feb, June, Aug, Sept, and Oct. 2008.

36.    Exhibit 36: September 12, 2008 Prudential Emails, (PR-E 04548-04554).

37.    Exhibit 37: September 26, 2008 Prudential Emails, (PR-E 04536-04537).

38.    Exhibit 38: September 2008 Prudential Emails, (PR-E 04323-04332).

39.    Exhibit 39: October 28-30, 2008 Prudential Emails, Weekly billing lists, (PR-E 04448-04451).

40.    Exhibit 40: October 28, 2008 Prudential Emails for Weekly Billing List10-27-08, (PR-E 04445-04447).

41.    Exhibit 41: July 29, 2008 Prudential Emails on Net Terms, (PR-E 04337-04338).

42.    Exhibit 42: October 27, 2008 Eclipse Email on Payment Shrinkage, (AETrusteeDisc002601).

43.    Exhibit 43: October 28, 2008 Eclipse Emails on no payment that week, (AETrusteeDisc002602-3).

44.    Exhibit 44: Prudential Account Receivable List 11-06-08, (PR-E 04457-04569).

**Plaintiff (may use)**

45.    Exhibit 45: September 3, 2008 Prudential Email, Names On Billing Review (PR-E 04532).

46.    Exhibit 46: Chart regarding analysis of Exhibits 24-35.

47.    Exhibit 47: Chart regarding analysis of Payment History

48.    Exhibit 48: July 28, 2008 email of Henry Andrews, Senior Director, Strategic Sourcing of Eclipse, In July 2008, Eclipse was having financing issues and management team changes, … we are now examining how to roll the new Eclipse financing info into our accounts payable servicing.  Given how important this is to Eclipse's supplier base, this is a HUGE priority for us that we're working in real time. More soonest." (AETrusteeDisc.000223).

49.    Exhibit 49: Peg Bilson, Eclipse COO, email dated July 27, 2008, management changes, AE000199-201 or AETrusteeDisc000201-3; Eclipse Press Release dated July 28, 2008, management changes and new financing, (AE000202-3 or AETrusteeDisc000204-5).

50.    Exhibit 50: On August 15, 2008, Eclipse email "we are conserving our cash." (AETrusteeDisc000206).

51.    Exhibit 51: August 19, 2008, Peg Bilson, Eclipse COO, sent letter of invitation to suppliers regarding upcoming supplier's conference. AE002586 or (AETrusteeDisc000221).

52.    Exhibit 52: Eclipse August 26, 2008 Supplier Conference Agenda (AE002584-5 or AETrusteeDisc000219-21).

53.    Exhibit 53: Roel Pieper, Eclipse letter dated August 18, 2008 to Suppliers, "paying off your receivables" (AETrusteeDisc000190-1).

54.    Exhibit 54: Peg Bilson, Eclipse COO, September 9, 2008 letter to suppliers, re Supplier's Conference and regarding the change in conditions in the Eclipse's payment schedules, (AETrusteeDisc000189).

55.    Exhibit 55: October 10, 2008, Peg Bilson, Eclipse COO, Hampson sues Eclipse, and Eclipse tells vendors "we will pay your past due accounts as soon as our final round of financing becomes available", (AETrusteeDisc002600).

56.    Exhibit 56: Chart of payment comparison of preference period to same period in previous year.

57.    Exhibit 57: Chart of November 2008 transfers.

58.    Exhibit 58: Chapter 11 Claims Register [D.I. 555].

45

59.     Exhibit 59: Chapter 7 Claims Register.

60.     Exhibit 60: By final court order, deficiency claims have been allowed in the approximate amount of $567,000,000.00. [D.I. 714 (Stipulation and Agreed Order)].

61.     Exhibit 61: By final order, this Court has allowed a chapter 11 administrative expense claim in the amount of $1,849,449.00 for the benefit of Computer Sciences Corporation. [D.I. 1011].

62.     Exhibit 62: By final order, this Court has allowed chapter 11 administrative expense claims in the amount of $519,285.98 for the benefit of Bernalillo County Treasurer. [D.I. 1295].

63.     Exhibit 63: March 21, 2011 Scheduling Order [D.I. 7].

64.     Exhibit 64: Time Lags of Preference Period Invoices Paid Per "Aged Invoices", "Current Invoices," and "Weekly Billing List."

65.     Exhibit 65: Proof of Claim (35) invoices dated August 27–29, 2008 (PR-E 00329, 365-367, 408-439).

66.     Exhibit 66: Check Amounts Calculated for Pre-Preference Period.

67.     Exhibit 67: Pre-Pref. Averages by Separate Years.

68.     Exhibit 68: Statement of Financial Affairs [Main Case D.I. 261].

69.     Exhibit 69: Trustee Rule 26F letter, Eclipse, 03-09-11.

70.     Exhibit 70: Motion to Employ Sutin, Thayer & Browne, P.C. [Main Case D.I. 1324].

71.     Exhibit 71: Order to Employ Sutin, Thayer & Browne, P.C. [Main Case D.I. 1333].

72.     Exhibit 72: Email of Andrew Kamm, CFO of Eclipse July 7, 2009.

73.     Exhibit 73. PR-E 00125-00134, Prudential Admission of Pref. Checks Received.

**Defendants**

46

**Defendants reserve the right to use any of the aforementioned exhibits identified by Plaintiff.**

Exhibit A: Relocation Services Agreement (the Contract), dated 2006 (PR-E 00001-00029).

Exhibit A.1: Preference Analysis.

Exhibit A.2: New Value Analysis and Related Invoices  (PR-E 00441-00446, 00449, 00457, 00460, 00470, 00472-00489, 00493-00494, 00502, 00504, 00507-00508, 00510-00511, 00515, 00523-00524, 00530, 04637).

Exhibit B: Pre-Preference payment of $174,787.12, dated November 28, 2006, and invoices paid (PR-E 02448-02262).

Exhibit C: Pre-Preference payment of $103,021.49, dated December 1, 2006, and invoices paid (PR-E 02263-02294).

Exhibit D: Pre-Preference payment of $49,952.37, dated December 11, 2006, and invoices paid (PR-E 02295-02337).

Exhibit E: Pre-Preference payment of $59,580.31, dated December 19, 2006, and invoices paid (PR-E 02338-02366).

Exhibit F: Pre-Preference payment of $44,601.19, dated December 29, 2006, and invoices paid (PR-E 02367-02384).

Exhibit G: Pre-Preference payment of $165,479.59, dated January 5, 2007, and invoices paid (PR-E 02385-02427).

Exhibit H: Pre-Preference payment of $228,114.98, dated January 12, 2007, and invoices paid (PR-E 02428-02458).

Exhibit I: Pre-Preference payment of $219,298.25, dated January 22, 2007, and invoices paid (PR-E 02459-02516).

Exhibit J: Pre-Preference payment of $66,504.24, dated January 29, 2007, and invoices paid (PR-E 02517-02543).

Exhibit K: Pre-Preference payment of $259,090.64, dated February 5, 2007, and invoices paid (PR-E 02544-02556).

Exhibit L: Pre-Preference payment of $97,073.50, dated February 9, 2007, and invoices paid (PR-E 02557-02589).

Exhibit M: Pre-Preference payment of $160,702.29, dated February 20, 2007, and invoices paid (PR-E 02590-02627).

Exhibit N: Pre-Preference payment of $156,883.64, dated February 27, 2007, and invoices paid (PR-E 02628-02663).

Exhibit O: Pre-Preference payment of $108,760.47, dated March 6, 2007, and invoices paid (PR-E 02664-02683).

Exhibit P: Pre-Preference payment of $58,048.01, dated March 9, 2007, and invoices paid (PR-E 02684-02692).

Exhibit Q: Pre-Preference payment of $157,370.32, dated March 21, 2007, and invoices paid (PR-E 03226-03264).

Exhibit R: Pre-Preference payment of $111,437.47, dated March 26, 2007, and invoices paid (PR-E 03265-03299).

Exhibit S: Pre-Preference payment of $204,211.17, dated April 2, 2007, and invoices paid (PR-E 03300-03340).

Exhibit T: Pre-Preference payment of $72,008.09, dated April 9, 2007, and invoices paid (PR-E 03341-03360).

Exhibit U: Pre-Preference payment of $98,823.66, dated April 18, 2007, and invoices paid (PR-E 03361-03392).

Exhibit V: Pre-Preference payment of $128,609.21, dated April 23, 2007, and invoices paid (PR-E 03393-03426).

Exhibit W: Pre-Preference payment of $67,733.36, dated April 30, 2007, and invoices paid (PR-E 03427-03445).

Exhibit X: Pre-Preference payment of $104,898.21, dated May 7, 2007, and invoices paid (PR-E 02693-02722).

Exhibit Y: Pre-Preference payment of $102,201.14, dated May 14, 2007, and invoices paid (PR-E 02723-02754).

Exhibit Z: Pre-Preference payment of $40,141.93, dated May 21, 2007, and invoices paid (PR-E 02755-02767).

Exhibit AA: Pre-Preference payment of $135,626.62, dated June 4, 2007, and invoices paid (PR-E 02768-02793).

Exhibit BB: Pre-Preference payment of $27,843.84, dated June 8, 2007, and invoices paid (PR-E 02794-02811).

Exhibit CC: Pre-Preference payment of $55,230.39, dated June 18, 2007, and invoices paid (PR-E 02812-02829).

Exhibit DD: Pre-Preference payment of $50,754.08, dated June 22, 2007, and invoices paid (PR-E 02830-02850).

Exhibit EE: Pre-Preference payment of $169,638.00, dated July 2, 2007, and invoices paid (PR-E 02851-02905).

Exhibit FF: Pre-Preference payment of $24,550.00, dated July 9, 2007, and invoices paid (PR-E 02906-02920).

Exhibit GG: Pre-Preference payment of $75,655.85, dated July 23, 2007, and invoices paid (PR-E 02921-02954).

Exhibit HH: Pre-Preference payment of $41,045.09, dated July 27, 2007, and invoices paid (PR-E 02955-02983).

Exhibit II: Pre-Preference payment of $173,833.33, dated August 6, 2007, and invoices paid (PR-E 02984-03031).

Exhibit JJ: Pre-Preference payment of $102,014.50, dated August 10, 2007, and invoices paid (PR-E 03032-03074).

Exhibit KK: Pre-Preference payment of $51,880.49, dated August 20, 2007, and invoices paid (PR-E 02851-02905).

Exhibit LL: Pre-Preference payment of $127,066.33, dated August 27, 2007, and invoices paid (PR-E 03117-03160).

Exhibit MM: Pre-Preference payment of $116,198.81, dated August 31, 2007, and invoices paid (PR-E 03161-03217).

Exhibit NN: Pre-Preference payment of $107,794.82, dated September 10, 2007, and invoices paid (PR-E 03218-03225).

Exhibit OO: Pre-Preference payment of $180,717.07, dated September 17, 2007, and invoices paid (PR-E 03446-03466, 04560-04593).

Exhibit PP: Pre-Preference payment of $113,801.94, dated October 22, 2007, and invoices paid (PR-E 03602-03664).

Exhibit QQ: Pre-Preference payment of $32,282.32, dated October 29, 2007, and invoices paid (PR-E 03665-03700).

Exhibit RR: Pre-Preference payment of $141,624.85, dated November 5, 2007, and invoices paid (PR-E 03701-03778).

Exhibit SS: Pre-Preference payment of $313,499.86, dated November 13, 2007, and invoices paid (PR-E 03779-03867).

Exhibit TT: Pre-Preference payment of $207,648.16, dated November 27, 2007, and invoices paid (PR-E 03868-03987).

Exhibit UU: Pre-Preference payment of $214,659.49, dated December 3, 2007, and invoices paid (PR-E 03988-04059).

Exhibit VV: Pre-Preference payment of $199,951.34, dated December 10, 2007, and invoices paid (PR-E 04060-04160).

Exhibit WW: Pre-Preference payment of $200,168.93, dated December 24, 2007, and invoices paid (PR-E 04199-04310).

Exhibit XX: Pre-Preference payment of $200,188.49, dated December 26, 2007, and invoices paid (PR-E 00092-00093, 04594-04635, 04161-04198).

Exhibit YY: Pre-Preference payment of $900,195.24, dated January 4, 2008, and invoices paid (PR-E 00541-00844).

Exhibit ZZ: Pre-Preference payment of $198,755.70, dated January 8, 2008, and invoices paid (PR-E 00845-00911).

Exhibit AAA: Pre-Preference payment of $83,109.24, dated January 11, 2008, and invoices paid (PR-E 00912-00947).

Exhibit BBB: Pre-Preference payment of $511,901.69, dated January 18, 2008, and invoices paid (PR-E 00948-01108).

Exhibit CCC: Pre-Preference payment of $22,098.85, dated January 29, 2008, and invoices paid (PR-E 01109-01118).

Exhibit DDD: Pre-Preference payment of $99,970.18, dated February 4, 2008, and invoices paid (PR-E 01119-01141).

Exhibit EEE: Pre-Preference payment of $54,997.67, dated February 8, 2008, and invoices paid (PR-E 01142-01158).

Exhibit FFF: Pre-Preference payment of $81,393.73, dated February 25, 2008, and invoices paid (PR-E 01159-01169).

Exhibit GGG: Pre-Preference payment of $184,303.81, dated March 3, 2008, and invoices paid (PR-E 01171-01204).

Exhibit HHH: Pre-Preference payment of $74,339.85, dated March 10, 2008, and invoices paid (PR-E 01205-01244).

Exhibit III: Pre-Preference payment of $17,272.81, dated March 17, 2008, and invoices paid (PR-E 01245-01268).

Exhibit JJJ: Pre-Preference payment of $50,514.64, dated March 24, 2008, and invoices paid (PR-E 01269-01298).

Exhibit KKK: Pre-Preference payment of $29,211.68, dated March 31, 2008, and invoices paid (PR-E 01299-01309).

Exhibit LLL: Pre-Preference payment of $77,299.55, dated April 7, 2008, and invoices paid (PR-E 01310-01318).

Exhibit MMM: Pre-Preference payment of $82,655.91, dated April 14, 2008, and invoices paid (PR-E 01319-01384).

Exhibit NNN: Pre-Preference payment of $72,227.63, dated April 28, 2008, and invoices paid (PR-E 01385-01431).

Exhibit OOO: Pre-Preference payment of $186,814.39, dated May 12, 2008, and invoices paid (PR-E 01432-01472).

Exhibit PPP: Pre-Preference payment of $34,744.76, dated May 19, 2008, and invoices paid (PR-E 01473-01508).

Exhibit QQQ: Pre-Preference payment of $70,627.35, dated May 27, 2008, and invoices paid (PR-E 01509-01538).

Exhibit RRR: Pre-Preference payment of $73,807.91, dated June 2, 2008, and invoices paid (PR-E 01539-01588).

Exhibit SSS: Pre-Preference payment of $125,076.59, dated June 16, 2008, and invoices paid (PR-E 01589-01632).

Exhibit TTT: Pre-Preference payment of $29,715.15, dated June 23, 2008, and invoices paid (PR-E 01633-01639).

Exhibit UUU: Pre-Preference payment of $143,967.97, dated June 30, 2008, and invoices paid (PR-E 01640-01670).

Exhibit VVV: Pre-Preference payment of $70,485.29, dated July 21, 2008, and invoices paid (PR-E 01671-01709).

Exhibit WWW: Pre-Preference payment of $128,111.76, dated August 4, 2008, and invoices paid (PR-E 01710-01760).

Exhibit XXX: Pre-Preference payment of $119,078.48, dated August 4, 2008, and invoices paid (PR-E 01761-01796).

Exhibit YYY: Pre-Preference payment of $43,193.54, dated August 12, 2008, and invoices paid (PR-E 01797-01807).

Exhibit ZZZ: Emails (PR-E 04355-04359).

Exhibit AAAA: Emails (PR-E 04368-04369)

Exhibit BBBB: Emails (PR-E 04372-04376).

Exhibit CCCC: Emails (PR-E 04379-04382).

Exhibit DDDD: Emails (PR-E 04383-04386).

Exhibit EEEE: Emails (PR-E 04448-04449).

Exhibit FFFF: Preference payment of $50,890.09, dated September 2, 2008, and invoices paid (PR-E 01808-01841).

Exhibit GGGG: Preference payment of $50,964.05, dated September 8, 2008, and invoices paid (PR-E 01842-01881).

Exhibit HHHH: Preference payment of $49,928.66, dated September 15, 2008, and invoices paid (PR-E 01882-01918).

Exhibit IIII: Preference payment of $51,965.13, dated September 22, 2008, and invoices paid (PR-E 01919-01946).

Exhibit JJJJ: Preference payment of $50,405.51, dated September 29, 2008, and invoices paid (PR-E 01947-01961).

Exhibit KKKK: Preference payment of $74,791.02, dated October 6, 2008, and invoices paid (PR-E 01962-01989).

Exhibit LLLL: Preference payment of $75,080.53, dated October 14, 2008, and invoices paid (PR-E 01990-02045).

Exhibit MMMM: Preference payment of $76,892.83, dated October 20, 2008, and invoices paid (PR-E 02046-02090).

Exhibit NNNN: Preference payment of $74,907.61, dated November 3, 2008, and invoices paid (PR-E 02091-02149).

Exhibit OOOO: Preference payment of $74,718.23, dated November 7, 2008, and invoices paid (PR-E 02163-02195).

Exhibit PPPP: Preference payment of $76,179.85, dated November 14, 2008, and invoices paid (PR-E 02150-02162).

Exhibit QQQQ: Preference payment of $74,979.10, dated December 12, 2008, and invoices paid (PR-E 02196-02215).

Exhibit RRRR: Unpaid Invoices, dated June 30, 2006 – June 19, 2009 (PR-E 00031-00039, 00440-00536, additional invoices provided to counsel as part of a June 30, 2009 correspondence from Joseph L. Clasen to Steve E. Bridgett).

Exhibit SSSS: Eclipse Receipts 11.06 – 2.09 (PR-E 00051-00135).

## VIII.   WITNESSES[3]

### 1.    **Plaintiff (if necessary)**

Jeoffrey L. Burtch, Chapter 7 Trustee for the Debtor – Trustee's prima facia case and authentication of records.

Claire McCudden, Esq. – Counsel for the Trustee – Trusee's prima facia case and authentication of records.

### 2.    **Defendants**

**Rene Williams-Varner, Director of Accounting for Defendants, Prudential's affirmative defenses and authentication of records**

---

[3] The listing of any witness in this Order is not an agreement as to the admissibility of testimony by such witness (or the right of a party to call such witness to testify) and the parties expressly reserve all rights to object to the admissibility of any listed exhibit.

## DISCOVERY ITEMS AND TRIAL DEPOSITIONS TO BE OFFERED INTO EVIDENCE[4]

### Plaintiff – Deposition Testimony

No Deposition Testimony will be offered.

### Plaintiff – Discovery Items (may be used)

1.      *"Plaintiff's Objections and Responses to Defendants First Set of Requests for Interrogatories, Requests for Production of Documents, and Requests for Admission"*, served June 8, 2011, which included AE000001-AE002587 (aka AETrusteeDisc000001-002598) and AE/Prud000001-AE/Prud000142, [D.I. 16], attached hereto as Plaintiff's Exhibit 9.

2.      *"Plaintiff's Supplemental Responses to Defendants First Set of Requests for Production of Documents"*, served October 21, 2011, AETrusteeDisc002599-5034 and AE/Prud000142–AE/Prud001556, [D.I. 20].

3.      Plaintiff's August 7, 2012 supplemental production of documents, AE/Prud000142-191.

4.      *Defendants Prudential Real Estate and Relocation Services, Inc., and Prudential Relocation, Inc. Responses to Plaintiff's First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents"*, served July 5, 2011, attached hereto as Plaintiff's Exhibit 12.  Responses to Requests for Admission Nos. 1, 2, 3, 4, 6, 14, 15, and 17; and Response to Interrogatory Nos. 1, 3, 4, 5, 6, 7, 9, 10, 12, 13, 16, 17, and 21.

---

[4] The listing of any deposition designations exhibit in this Order is not an agreement as to the admissibility of any such designation and the parties expressly reserve all rights to object to the admissibility of any listed designation.

5.    *Defendants Prudential Real Estate and Relocation Services, Inc., and Prudential Relocation, Inc. Responses to Plaintiff's First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents*", served July 5, 2011 PR-E 00001 – 04310, attached hereto as Plaintiff's Exhibit 12.

6.    Prudential's supplemental production of documents, PR-E 04311-PR-E 04559, served August 22, 2011 ("Prudential's Supplemental Production").

7.    On March 21, 2011, a discovery scheduling conference was held in front of this Court, and a discovery scheduling order (the "Scheduling Order") [D.I. 7] was entered immediately thereafter. *See* Plaintiff's Exhibit 63.  Pursuant to the Scheduling Order all discovery ended February 24, 2012.

**Defendants – Deposition Testimony**

No Deposition Testimony will be offered.

**Defendants – Discovery Items (may be used)**

In addition to the discovery items set forth by Plaintiff above, Prudential may rely on (1) invoices enclosed in a June 30, 2009 correspondence from Joseph L. Clasen to Steve E. Bridgett and (2) Prudential's supplemental production PR-E 04560-04637 served on February 28, 2013.

## IX.    STATEMENT OF WHAT THE PLAINTIFF INTENDS TO PROVE IN SUPPORT OF THE PLAINTIFF'S CLAIMS, INCLUDING DAMAGES CLAIMED OR OTHER RELIEF.

The Debtor transferred $781,702.61 to Prudential during the Preference Period.  The Trustee will recognize a maximum Section 547(c)(4) new value defense of Prudential totaling $56,057.42. The other amounts claimed by Prudential as constituting new value were advanced to the Debtors prior to the Preference Period or are not documented as being provided during the

Preference Period. The Defendant will not be able to a Section 547(c)(1) contemporaneous exchange of new value defense.

The Transfers are avoidable and recoverable by the Trustee, as Prudential will not be able to prove a Section 547(c)(2) ordinary course defense that the payments were made in the "ordinary course of business": there was a five week $50,000 per week payment plan paying aged invoices, then Prudential forced a seven week $75,000 per week payment plan, initially paying current invoices, then the last four weeks paying weekly billing lists and the invoices were issued after the transfer was received. Also the last three transfers were by wire, and the last two wires were not from the operating account but from the employee payroll account.

Accordingly, Plaintiff seeks to recover the reduced amount of $725,645.19 plus pre and post judgment interest and cost. The Plaintiff requests pre-judgment interest of 6% on the $725,645.19 from the date of the Transfers.

## X.    STATEMENT OF WHAT THE DEFENDANT INTENDS TO PROVE AS DEFENSES.

None of the subject Transfers are avoidable and recoverable by the Trustee, given the applicability of the ordinary course and new value defenses.

To the extent any portion of the Transfers are avoidable and recoverable, the Trustee is not entitled to prejudgment interest. The Trustee would have this Court believe that the awarding of prejudgment interest in preference actions is a common occurrence. In reality, it has only cited **one** case where this Court awarded such interest. *Burtch v. Masiz, et al. (In re Vaso Active Pharmaceuticals, Inc.)*, 2012 WL 4793241 *23, 24 (Bank.D.Del.)  In *Vaso*, the Trustee successfully pursed fraudulent transfer claims and the Court explicitly noted that, in awarding prejudgment interest, "[d]efendants acted with premeditated intent to pursue their own remuneration at the expense of Debtor's other creditors." *Id.*

Here, the Trustee does not even allege any "premeditated intent" by Prudential to defraud or hinder other creditors.    Instead, the parties, at worst, have a good faith dispute as to the applicability of ordinary course and new value affirmative defenses.

Finally, even if prejudgment interest were appropriate, this Court should not award 6% as requested by the Trustee.    The Trustee's only authority for such a punitive interest rate is a later October 19, 2012 decision in *Vaso,* which provides no reasoning for why 6% was selected. *See* Adv. Pro. No. 11-52005 D.I. 59.    Instead, the Court should look to the current post-judgment interest rate, as it has explicitly noted is the appropriate prejudgment interest rate  In re: USN Communications, Inc., 280 B.R. 573, 603 (Bank.D.Del.) (explicitly noting that "[m[ost federal courts which have addressed the issue of the applicable prejudgment interest rate in a case involving a federal question have used the applicable federal postjudgment interest rate . . .") (*quoting Brantley v. Weeks (In re Brantley)*, 116 B.R. 442, 448 (Bankr. D. Md. 1990).

## XI.    STATEMENTS BY COUNTERCLAIMANTS OR CROSSCLAIMANTS.

Not applicable.

## XII.    AMENDMENTS TO PLEADINGS

Not applicable.

## XIII.    CERTIFICATION OF COUNSEL

Pursuant to Rule 7016-2(d)(xiii) of the Local Rules for United States Bankruptcy Court for the District of Delaware, the Parties certify that they have engaged in a good faith effort to explore the resolution of the controversy by settlement.

## XIV.    ANY OTHER MATTERS THE PARTIES DEEM APPROPRIATE.

Pursuant to the March 21, 2011 Scheduling Order [D.I. 7, *see* Plaintiff Exhibit 63] all discovery closed on February 24, 2012, over a year ago.  Last week, on February 28, 2013,

Prudential produced additional documents, PR-E 4560-4637 (the "Late Produced Documents") and in addition is now for the first time identifying an employee as a witness (the "Late Identified Employee Witness for the Industry Standard") for the Section 547(c)(2)(B) "industry standard" element for the ordinary course defense. Plaintiff will be preparing to file a motion in limine, asking the Court not to admit as evidence at trial the Late Produced Documents nor allow the Late Identified Employee Witness for the Industry Standard to testify. The legal bases for the relief sought is set forth in the Motion, and will also apply as to any documents, information, or witnesses produced by Prudential after March 4, 2013, subsequent to the filing of Plaintiff's motion in limine.

Prudential maintains that that Plaintiff is not entitled to any of the relief it would seek in a motion in limine. For each Pre-Preference and Preference Period payment, Prudential produced a cover sheet setting forth the invoices paid through each payment followed by copies of the subject invoices. In totality, this production accounted for more than 3,000 invoices. In preparing for trial, Prudential noted that a small percentage of these invoices (less than 80) were not accompanying the cover sheet and thus **may not** have been produced. Thus, Plaintiff added these invoices to appropriately include within the trial exhibits.

Plaintiff has suffered zero prejudice from this production as (even if Prudential did not previously produce them), Plaintiff had knowledge of the invoices as they were included on various spreadsheets produced by both parties. Additionally, Plaintiff failed to produce a set of the subject invoices (despite Eclipse receiving all invoices through its business dealings with Prudential). *Additionally, Plaintiff is attempting to use documents (Trial Exhibits 6 and 10) that it produced in August 2012, six months after the discovery cutoff.* Prudential reserves the right

to seek the exclusion of Plaintiff's use of the documents served after the discovery cutoff, via a motion in limine or otherwise.

As for the supposed failure to designate a witness to prove industry standards, as noted by Prudential above, employee and not expert testimony is all that is required.  Prudential intends to introduce the testimony of its Director of Accounting, Rene Williams-Varner.  Ms. Williams-Varner was disclosed in Prudential's discovery responses as someone who has knowledge as to Prudential's affirmative defenses.  She also signed the verification on behalf of Prudential.  The interrogatory referred to by the Trustee refers to any "expert witness" that will be disclosed. Prudential does not offer Ms. Williams-Varner as an expert witness, but a representative who factually can testify as how the business terms of the subject relationship compare to industry standards.

As permitted by the Court's Pretrial Procedures, the parties reserve their respective rights to submit a trial brief.

ESTIMATED LENGTH OF TRIAL: The parties believe the trial will last two days.

**XV.**   **THIS ORDER SHALL CONTROL THE SUBSEQUENT COURSE OF THE ACTION UNLESS MODIFIED BY THE COURT TO PREVENT MANIFEST INJUSTICE.**

COOCH AND TAYLOR, P.A.

Paula C. Witherow (#2851)
Robert W. Pedigo (#4047)
M. Claire McCudden (#5036)
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE 19899-1680
(302) 984-3800

*Attorneys for Jeoffrey L. Burtch, Chapter 7
Trustee for AE Liquidation, Inc., et al.*

Dated: March 6, 2013
            Wilmington, Delaware

GELLERT SCALI BUSENKELL &
BROWN LLC

Charles J. Brown (#3368)    *w/ permission*
913 Market Street, Suite 1001
Wilmington, DE 19801
302-425-5813

and

ROBINSON & COLE LLP
Joseph L. Clasen
1055 Washington Blvd.
Stamford, CT 06901
203-462-7500

*Attorneys for Prudential Real Estate and
Relocation Services, Inc., and Prudential
Relocation, Inc.*

Dated: March 6, 2013
            Wilmington, Delaware

Dated: March ____, 2013

_____
THE HONORABLE MARY F. WALRATH
United States Bankruptcy Court Judge

60