**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AE LIQUIDATION, INC., et al. | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-55543 (MFW) |
| | ) | |
| PRUDENTIAL REAL ESTATE AND | ) | |
| RELOCATION SERVICES, INC., | ) | |
| AND PRUDENTIAL RELOCATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OPINION**[1]

Before the Court is the Complaint filed by Jeoffrey L. Burtch, the chapter 7 trustee of the Debtors[2] (the "Trustee"), to avoid and recover preferential transfers against Prudential Real Estate and Relocation Services, Inc., and Prudential Relocation, Inc. (collectively, "Prudential"). After a trial on the merits, the Court concludes that judgment should be entered in favor of the Trustee for the reasons set forth below.

_____

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] The debtors are AE Liquidation, Inc. (f/k/a Eclipse Aviation Corporation) and EIRB Liquidation, Inc. (f/k/a Eclipse IRB Sunport, LLC), a wholly owned subsidiary of Eclipse Aviation Corporation (collectively "Eclipse").

I.    <u>BACKGROUND</u>

Eclipse manufactured private jets from its principal place of business in Albuquerque, New Mexico.  Prudential provides relocation benefits to its clients' employees.  Beginning in 2001, Prudential began providing relocation benefits to Eclipse's employees.  Effective May 1, 2006, Prudential and Eclipse entered into a Relocation Services Agreement (the "Agreement") to perform the following relocation services: (i) relocation policy counseling, (ii) marketing assistance, (iii) buyer value option services, (iv) destination services, (v) transportation assistance, (vi) cost tracking and expense processing, and (vii) expense advance and reimbursement (collectively, the "Relocation Services").  (Def. Ex. A.)  During the first year of the Agreement, there were 1,496 transactions from May 1, 2006, through April 30, 2007, which Eclipse took an average 35.9 days to pay.

In November 2007, Eclipse began falling behind on payments.  At that time, Prudential's total account receivable balance for Eclipse (the "AR") was over $2 million, of which $316,983.26 was over 60 days past due.  Prudential initiated a payment plan whereby Eclipse was required to pay approximately $200,000 per week with a lump sum payment of $900,000 due on December 31, 2007 (the "First Payment Plan").  (Tr. 3/12/13 at 79-80.)  Rene Williams-Varner, Prudential's Director of Accounting, testified

that Eclipse was also put on "billing review," an accounting term
that stopped new initiations from coming in unless an extra audit
was done to examine expenses more closely. (Id. at 84-85.)  The
actual weekly lump sum payments were slightly higher or lower
than the required amount, because Prudential linked the payments
to outstanding invoices.  As a result of the First Payment Plan,
Eclipse's AR for 16 to 60 days past due was reduced from $901,000
to approximately $2,600 and AR over 60 days past due was reduced
from $317,000 to $7,800.  By January 2008, Eclipse had satisfied
the obligations of the First Payment Plan and was taken off
billing review.  (Id. at 89.)

In March 2008, Eclipse began falling behind again.  By
August 2008, the AR had increased to $800,000, of which $600,000
was more than 60 days past due.  (Tr. 3/13/13 at 59.)  On August
28, 2008, Prudential learned that Eclipse had discharged
approximately 650 employees, who were instructed to submit any
outstanding relocation expenses incurred prior to August 22,
2008, for reimbursement.  (Tr. 3/12/13 at 127.)  Prudential
further learned that expenses incurred after August 22, 2008,
were not going to be paid by Eclipse except for a few case by
case exceptions.  (Tr. 3/13/13 at 30.)

That same day, Prudential placed Eclipse on billing review
again.  Prudential and Eclipse agreed that Eclipse would make
$50,000 weekly payments plus a lump sum payment at the end to

satisfy the $945,000 AR balance and bring the account current (the "Second Payment Plan").  (Id. at 91-94.)

Two weeks into the Second Payment Plan, Prudential learned that Eclipse would be unable to make the lump sum payment without obtaining additional financing.  On September 22, 2008, Prudential requested (and Eclipse agreed to) an increase to $75,000 per week to bring the AR current (the "Amended Payment Plan").  (Id. at 138-41.)

On November 25, 2008, Eclipse filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").  On March 5, 2009, the case was converted to chapter 7 and the Trustee was subsequently appointed.

Within the 90 days preceding the Petition Date (the "Preference Period"), Eclipse made twelve transfers to Prudential totaling $781,702.61 (the "Transfers"):

| Check Number | Check "Cut" Date | Check "Clear" Date | Check Amount |
|---|---|---|---|
| 56817 | 8/27/2008 | 9/02/2008 | $ 50,890.09 |
| 56973 | 9/03/2008 | 9/08/2008 | $ 50,964.05 |
| 57127 | 9/10/2008 | 9/15/2008 | $ 49,928.66 |
| 57301 | 9/17/2008 | 9/22/2008 | $ 51,965.13 |
| 57436 | 9/24/2008 | 9/29/2008 | $ 50,405.51 |
| 57579 | 10/01/2008 | 10/06/2008 | $ 74,791.02 |
| 57710 | 10/08/2008 | 10/14/2008 | $ 75,080.53 |
| 57858 | 10/15/2008 | 10/20/2008 | $ 76,892.83 |
| 58049 | 10/22/2008 | 10/27/2008 | $ 74,907.61 |
| Wire | 10/30/2008 | 10/30/2008 | $ 74,718.23 |
| Wire | 11/06/2008 | 11/06/2008 | $ 76,179.85 |
| Wire | 11/20/2008 | 11/20/2008 | $ 74,979.10 |

The first five Transfers were made pursuant to the Second

Payment Plan and the remaining Transfers were made pursuant to the Amended Payment Plan. The last three Transfers were by wire (the first from the operating account and the last two from Eclipse's employee payroll account).

On November 23, 2010, the Trustee commenced the instant adversary proceeding by filing a Complaint against Prudential asserting that the Transfers were preferential and avoidable under section 547(b) of the Bankruptcy Code. On February 7, 2011, Prudential filed an Answer to the Complaint in which it denied all allegations.

On March 12 and 13, 2013, a trial was held after which time the Court took the matter under submission. Post-trial briefing was completed on May 10, 2013, and the matter is ripe for decision.

## II. JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding. 28 U.S.C. §§ 1334(b) & 157(b)(1). This proceeding is a core matter. 28 U.S.C. § 157(b)(2)(A) & (F).

## III. DISCUSSION

### A. Preferential Transfers

Prudential argues that the Trustee has failed, as a matter of law, to establish a prima facie case under section 547(b). In the alternative, Prudential asserts two defenses under section

547(c): that the Transfers were made in the ordinary course of business and that they gave new value to or for the benefit of Eclipse.  The Trustee, of course, disagrees with Prudential and asserts that he has made a proper prima facie showing that the Transfers constitute a preference and that Prudential's section 547(c) affirmative defenses are without merit.

    1.   Section 547(b)

In order to make a prima facie showing under section 547(b), the Trustee must establish that the Prepetition Transfers were:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made -
>     (A) on or within 90 days before the date of the filing of the petition;
>     . . .
> (5) that enables such creditor to receive more than such creditor would receive if -
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  "Unless each and every one of these elements is proven, a transfer is not avoidable as a preference under 11 U.S.C. § 547(b)."  Waslow v. The Interpublic Grp. of Cos. (In re M Grp., Inc.), 308 B.R. 697, 700 (Bankr. D. Del. 2004).  The burden is on the plaintiff to prove each element.  11 U.S.C. §

6

547(g).  See Schwartz v. Pa. Dept. of Revenue, 93 B.R. 342, 344
(E.D. Pa. 1988) ("In an action to avoid a transfer under 11
U.S.C. § 547(b), the burden of proof is on the trustee . . . to
prove by a preponderance of the evidence each of the elements of
a voidable transfer.").

In the Trustee's First Set of Requests for Admissions,
Prudential admits that all elements of the Trustee's section
547(b) claim are satisfied with the exception of sections
547(b)(3) and (5).

        a.   Insolvency

The third element of an avoidable preference requires that
the transfer be "made while the debtor was insolvent . . . ."  11
U.S.C. § 547(b)(3).  For the purpose of preferential transfers,
it is presumed that the debtor is insolvent for the 90-day period
before the date of filing.  11 U.S.C. § 547(f).  At trial,
Prudential offered no evidence to rebut the presumption.
Therefore, the Court finds that Eclipse was insolvent at the time
of the Transfers.

        b.   Receipt of More Than Would be Received on
             Liquidation

The fifth and final element of an avoidable preference is
that the creditor receive more than it would have in a chapter 7
liquidation.  11 U.S.C. § 547(b)(5).  Referred to as the "greater
amount test," it requires a determination of what the creditor
would have received as part of a proper distribution under a

chapter 7 liquidation.  See Alvarado v. Walsh (In re LCO
Enters.), 12 F.3d 938, 941 (9th Cir. 1993) (noting that the
greater amount test "requires the court to construct a
hypothetical chapter 7 case and determine what the creditor would
have received if the case had proceeded under chapter 7").

Because Prudential received 100% of what it was owed for
each of the Transfers, the Court need only find that Prudential
would have received less than 100% of these claims in a chapter 7
liquidation.  See, e.g., Radnor Holdings Corp., et al. v. PPT
Consulting, LLC (In re Radnor Holdings, Corp.), Adv. No. 08-
51184(PJW), 2009 WL 2004226, at *2 (Bankr. D. Del. July 9, 2009)
("Courts consistently hold that as long as the distribution is
less than 100 percent, any payment to an unsecured creditor
during the preference period will enable that creditor to receive
more than he would have received in liquidation had the payment
not been made.").

At trial, the Trustee provided evidence that Eclipse's
estate has approximately $6.4 million to distribute to creditors.
(Tr. 3/12/13 at 38.)  These creditors include holders of chapter
7 administrative expense claims, chapter 11 administrative
expense claims, and holders of priority claims.  (Id. at 36-41.)
The Court has allowed chapter 7 expense claims in the amount of
approximately $2.3 million; the amount of chapter 11 expenses was
not calculated but the Trustee asserts it is insignificant.  (Id.

at 38.)  Further, according to the Claims Register, priority claims have been filed in the amount of $1.9 million.  (Id. at 39.)  With approximately $2 million remaining for distribution after administrative and priority claims are paid, general unsecured non-priority claims, which total $730 million, will not receive more than .27%.  Therefore, the Court concludes that Prudential would receive far less than 100% in a chapter 7 liquidation.

Having met the five requirements of section 547(b), the Court finds that the Trustee has made a prima facie showing that the Transfers were preferential.

B.   Section 547(c) Defenses

Once the plaintiff has made a prima facie showing that a transfer constitutes a preference under section 547(b), the burden shifts to the defendant to establish a defense under section 547(c).  11 U.S.C. § 547(g); see Burch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.), 453 B.R. 518, 527 (Bankr. D. Del. 2011).  Prudential asserts two defenses: (i) that the Transfers were made in the ordinary course of business under section 547(c)(2), and (ii) that Prudential gave new value after the Transfers to or for the benefit of Eclipse under section 547(c)(4).

1.   Ordinary Course of Business

Section 547(c)(2) permits a "safe harbor" for a transferee

of a preferential payment if "such transfer was in payment of a
debt incurred by the debtor in the ordinary course of business or
financial affairs of the debtor and the transferee," and such
transfer was (a) "made in the ordinary course of business or
financial affairs of the debtor and the transferee," or (b) made
according to "ordinary business terms."  11 U.S.C. § 547(c)(2).
In order to demonstrate that the ordinary course of business
exception applies, the creditor must prove by a preponderance of
the evidence that the transaction between the creditor and debtor
meets the ordinary course defense.  Miller v. Westfield Steel,
Inc. (In re Elrod Holdings Corp.), 426 B.R. 106, 110-11 (Bankr.
D. Del. 2010).

The ordinary course of business exception is designed to
balance the interests of the debtor and creditor.  Fiber Lite
Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical
Prods., Inc.), 18 F.3d 217, 219 (3d Cir. 1994).  In Molded
Acoustical, the Third Circuit stated:

> [T]he preference rule aims to ensure that creditors are
> treated equitably, both by deterring the failing debtor
> from treating preferentially its most obstreperous or
> demanding creditors in an effort to stave off a hard
> ride into bankruptcy, and by discouraging the creditors
> from racing to dismember the debtor.  On the other
> hand, the ordinary course exception to the preference
> rule is formulated to induce creditors to continue
> dealing with a distressed debtor so as to kindle its
> chances of survival without a costly detour through, or
> a humbling ending in, the sticky web of bankruptcy.

Id.  The Court must be cognizant of a debtor's need to maintain

constructive relationships with creditors.  When a debtor-
creditor relationship "has been cemented long before the onset of
insolvency — up through and including the preference period — we
should pause and consider carefully before further impairing a
creditor whose confident, consistent, ordinary extension of trade
credit has given the straitened debtor a fighting chance of
sidestepping bankruptcy and continuing in business."  Id. at 224-
225.

Here, the parties do not dispute that the first requirement
of section 547(c)(2) is satisfied: that the debt was incurred by
Eclipse in the ordinary course of business or financial affairs.
Prudential is in the business of providing relocation services to
Eclipse, which Eclipse purchased for its employees.  Their
business relationship lasted for approximately three years before
bankruptcy.  For these reasons, the Court finds that the first
prong of section 547(c)(2) is satisfied.

As to the second requirement of section 547(c)(2),
Prudential does not contend that the Transfers were made
according to "ordinary business terms" of the industry pursuant
to section 547(c)(2)(B).  Rather, it argues that the Transfers
were made in the ordinary course of business or financial affairs
between Eclipse and itself pursuant to section 547(c)(2)(A).

The determination of whether a creditor has met its burden
under section 547(c)(2)(A) is a subjective test involving the

consistency of transactions between the creditor and the debtor
before and during the preference period.  SEC v. First Jersey
Sec., Inc. (In re First Jersey Sec., Inc.), 180 F.3d 504, 512 (3d
Cir. 1999).  Courts have considered a myriad of factors in
determining such consistency: (i) the length of time the parties
engaged in the type of dealing at issue; (ii) whether the subject
transfers were in an amount more than usually paid; (iii) whether
the payments at issue were tendered in a manner different from
previous payments; (iv) whether there appears to have been an
unusual action by the creditor or debtor to collect on or pay the
debt; and (v) whether the creditor did anything to gain an
advantage (such as obtain additional security) in light of the
debtor's deteriorating financial condition.  See Burtch v.
Detroit Forming, Inc. (In re Archway Cookies), 435 B.R. 234, 241-
42 (Bankr. D. Del. 2010); Hechinger Liquidation Trust v. James
Austin Co. (In re Hechinger Inv. Co. of Del., Inc.), 320 B.R.
541, 548-49 (Bankr. D. Del. 2004).  No one factor is
determinative.  Burtch v. Revchem Composites, Inc. (In re Sierra
Concrete Design, Inc.), 463 B.R. 302, 306 (Bankr. D. Del. 2010).
Rather, the court should consider the relationship between the
creditor and the debtor during the preference period in its
entirety.  Id.

  a. Length of Engagement

 Under this factor, the Court must consider whether the

relationship was "of recent origin," as opposed to being "cemented long before the onset of insolvency." Molded Acoustical, 18 F.3d at 225 ("Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help a business fend off an unwelcome voyage into the labyrinths of a bankruptcy.").

In the case at bar, Prudential provided relocation services to Eclipse for approximately three years. During this period, the parties engaged in thousands of transactions. Based on the length of their business relationship and the numerous transactions between the parties, the Court finds that this relationship was of sufficient length to establish an ordinary course of dealing between the parties. See, e.g., Troisio v. E.B. Eddy Forrest Prods. Ltd., (In re Global Tissue, L.L.C.), 302 B.R. 808, 814 (D. Del. 2003) (holding that the parties' relationship of 15 months was sufficient); Unsecured Creditors' Comm. v. CBA Indus., Inc. (In re Color Title, Inc.), 239 B.R. 872, 875 (Bankr. D. Del. 1999) (holding that a relationship that existed for nearly three years was long enough).

b.    Similarity of Transactions

Under this factor, the Court must compare the Transfers in the Preference Period to the transfers made during the prior course of the parties' business relationship to determine if the

13

transactions were sufficiently similar.  In determining ordinary course of dealings between the parties, "[c]ourts place particular importance on the timing of payment." <u>Archway Cookies</u>, 435 B.R. at 243 (quoting <u>Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)</u>, Adv. No. 08-51184(PJW), 2009 WL 2004226, at *5 (Bankr. D. Del. July 9, 2009). Small deviations in timing will not preclude a finding of ordinariness, while greater deviations in the timing of payments are more likely to overcome an assertion of ordinariness. <u>Archway Cookies</u>, 435 B.R. at 243.  Overall, this inquiry is intensely fact specific.  <u>Goldstein v. Starnet Capital Grp., LLC (In re Universal Mktg., Inc.)</u>, 481 B.R. 318, 327 (Bankr. E.D. Pa. 2012).

Prudential argues that the timing of Eclipse's payment of invoices during the Preference Period remained similar to those paid throughout the parties' business dealings.  Ms. Williams-Varner testified that the average number of days between the invoice date and payment clearing date during the Preference Period was 28 days and that the average number of days to clear prior to the Preference Period was 45.3 days.  (Tr. 3/12/13 at 78; Tr. 3/13/13 at 26-27.)

Prudential argues that the difference of 17 days does not render such payments outside the ordinary course exception.  <u>See, e.g.</u>, <u>Global Tissue</u>, 302 B.R. at 812 (holding that while the

14

debtors made their payments a bit faster during the preference period than during the pre-preference period, the payment rate was still within the normal range of the parties' dealings); Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.), 182 B.R. 728, 737-38 (Bankr. W.D. Va. 1995) (holding that a difference between 54 days pre-preference and 67 days during the preference period did not make the payments out of the ordinary course of business); Branch v. Ropes & Gray (In re Bank of New England Corp.), 161 B.R. 557, 561 (Bankr. D. Mass. 1993) (holding that a difference between 38.4 days pre-preference and 54.7 days did not take the payments out of the ordinary course of business).

The Court disagrees.  The cases cited by Prudential held that longer days to pay in the preference period did not preclude a finding that the payment was made in the ordinary course because there was a pattern of late payments prior to the preference period.  In this case, however, Eclipse started paying quicker (not later) during the Preference Period.  Such earlier payments, especially if as a result of credit pressure from the creditor, can be outside the ordinary course of business.  See, e.g., Cellmark Paper, Inc. v. Ames Merch. Corp. (In re Ames Dept. Stores, Inc.), 470 B.R. 280, 285 (S.D.N.Y. 2012) (holding that invoices that were paid earlier than invoices from previous years was not in the ordinary course of business); Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.), Adv. No.

08-1690, 2010 WL 4622449, at *4-5 (Bankr. S.D.N.Y. Nov. 04, 2010) (holding that early payments on invoices just one day after the invoices were issued made them outside the ordinary course when the pre-preference average was 35 to 95 days); 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 504.04[2][ii], at 547-55 (16th ed. 2010) ("Just as payments that are made after the due date may be considered out of the ordinary course, payments may likewise be out of the ordinary course of business if they are early, that is before the due date, and the defendant does not produce evidence that early payment was the norm between the parties prior to the preference period.").

In this case, the evidence establishes that Prudential insisted on a quicker payment schedule as it became aware of Eclipse's financial troubles.  (Pl. Ex. 23.)  The ordinary course of business between the parties before the Preference Period had payments on a much more random and haphazard basis than the preference period payments.  Thus, the Court finds the <u>difference</u> between the averages for the Preference Period and the prior period is significant.

However, this is not the only factor to consider in determining whether the Transfers occurred in the ordinary course of business.  <u>See, e.g.</u>, <u>Liebersohn v. WTAE-TV (In re Pure Weight Loss, Inc.)</u>, 446 B.R. 197, 207 (Bankr. E.D. Pa. 2009) ("Persuasive authority in this Circuit suggests that courts

16

should look beyond the average payment time during the parties'
relationship to determine if the timing of preference period
payments were [sic] in the ordinary course of business."); Am.
Home Mortg., 476 B.R. at 138 (holding that the trustee's reliance
on the average payment time does not portray the complete picture
of the payment history).

   c. The Manner Tendered

   This factor considers whether any of the Transfers were
tendered differently during the pre-Preference Period.  See Am.
Home Mortg., 476 B.R. at 139.  The Trustee argues that the method
of payment changed for the final three Transfers because they
were made by wire and not by check.  In addition, he notes that
the final two Transfers were paid from Eclipse's payroll account,
rather than the operating account.  Prudential responds that it
was not its decision to have the last three Transfers paid by
wire or to have the last two Transfers paid from Eclipse's
payroll account.  Prudential argues that the unilateral decision
by Eclipse to do so should not be held against Prudential.
Prudential further asserts that such a simple change in payment
method alone does not take a payment out of the ordinary course.
Logan Square E. v. Peco Energy Co. (In re Logan Square E.), 254
B.R. 850, 856 (Bankr. E.D. Pa. 2000) (holding that while not
dispositive, the debtor's payment by cashier's check was a factor
the court could consider); Scroggins v. BP Exploration & Oil,

17

Inc. (In re Brown Transp. Truckload, Inc.), 161 B.R. 735, 740
(Bankr. N.D. Ga. 1993) (holding that simple changes in the method
of payment by a debtor to a creditor are not enough to make the
transaction extraordinary).

The Court agrees with Prudential.  Because Prudential did
not insist on the change in payment method, which lasted only
three weeks, the last three Transfers will not be considered out
of the ordinary course of business for this reason alone.

>        d.   Collection Efforts

Unusual collection activity between a debtor and creditor in
the preference period can defeat an ordinary course defense.
Montgomery Ward, LLC v. OTC Int'l, Ltd. (In re Montgomery Ward,
LLC), 348 B.R. 662, 678 (Bankr. D. Del. 2006).  Unusual action
can include "the potential manipulation of the credit schedules,
the threat or initiation of legal action or other unusual
behavior designed to improve the lot of one creditor at the
expense of the others."  Molded Acoustical, 18 F.3d at 225.
Telephone calls and other communications may be considered
unusual if they resemble "a calculated response to a
deteriorating creditor-debtor relationship."  Am. Home Mortg.,
476 B.R. at 139.

The Trustee argues that Prudential pressured Eclipse into
accepting the Amended Payment Plan and that such pressure makes
the Transfers not in the ordinary course of business.  After

Prudential determined that Eclipse would not be able to make the lump sum payment required by the Second Payment Plan, Prudential sent an email to Eclipse on September 30, 2008, stating:

> We have not received a response from Eclipse regarding our discussion last week about the weekly payment increase. . . . [Prudential] tried to reach you on the phone yesterday and left a detailed message asking for a response and have not heard back.  It is critical that we receive a response to our request to increase the weekly payments or to bring the account current.  If we do not receive a response by close of business tomorrow, 10/1/08, Prudential will need to re-evaluate our options, up to and including termination.

(Pl. Ex. 38 at 13-14.)  The Trustee argues that throughout its three-year relationship with Eclipse, Prudential did not customarily email Eclipse to collect unpaid invoices or threaten to terminate the Agreement.  The Trustee asserts that this type of pressure during the Preference Period is "almost per se not ordinary."  Bogdanov v. Avnet, Inc. (In re Amherst Techns., LLC, et al.), Adv. No. 07-1094-JMD, 2010 WL 3517066, at *6 (Bankr. D. N.H. 2010).  See also Fla. Steel Corp. v. Stober (In re Indus. Supply Corp.), 127 B.R. 62, 64-65 (Bankr. M.D. Fla. 1991) (holding that defendant's refusal to ship goods unless debtor reduced the level of debt owed to the defendant brought the transfers outside the protection of section 547(c)(2)).

The Court agrees with the Trustee that Prudential's threatening Eclipse into making increased payments to bring the AR current during the Preference Period was not in the ordinary course of business.  This type of ultimatum never occurred in the

19

pre-Preference Period (even in connection with the First Payment
Plan) and is the exact conduct that section 547 was meant to
eliminate.  See, e.g., HLI Creditor Trust v. Metal Techns.
Woodstock Corp. (In re Hayes Lemmerz Int'l., Inc.), 339 B.R. 97,
109 (Bankr. D. Del. 2006) ("Section 547 was designed to encourage
the equitable distribution of the debtor's assets to its
creditors, to prevent voracious creditors from forcing the debtor
during its slide into bankruptcy to make preferential payments to
those creditors, and to prevent debtors in those circumstances
from consciously preferring some creditors over others.").

     e.   Advantage in Light of Eclipse's Condition

     Examples of a creditor attempting to take advantage of the
debtor's financial condition include requesting additional
collateral or security, assessing late fees, or pressuring the
debtor for payment.  Am. Home Mortg., 476 B.R. at 140.
Additionally, a creditor's awareness of the debtor's financial
condition can indicate that the creditor is attempting to collect
a debt ahead of other creditors.  Id.  However, if the parties
had the same relationship for a substantial time frame prior to
the debtor's insolvency, actions that appear to take advantage of
the debtor may still be in the ordinary course of business.
Color Tile, 239 B.R. at 875.

     The Trustee's primary argument is that Prudential pressured
Eclipse into making payments by instituting differing payment

practices during the Preference Period.  The Trustee argues that
the Second Payment Plan and the Amended Payment Plan, which
required three levels of scrutiny, including billing review,
audit, and client services approval, represented a departure from
the parties' normal operating procedures.  See, e.g., Molded
Acoustical, 18 F.3d at 228 (holding that the creditor's
insistence that the debtor make larger payments pursuant to a
payment plan as a precondition for further shipments of goods
successfully mounted pressure on the debtor and was thus not
ordinary); Roberds, Inc. v. Broyhill Furniture (In re Roberds,
Inc.), 315 B.R. 443, 466-67 (Bankr. S.D. Ohio 2004) (holding that
the drastic change in the parties' credit arrangement during the
preference period caused the transfers to be extraordinary).

Ms. Williams-Varner testified that for the first year of
their relationship, Eclipse was paying its AR timely.  (Tr.
3/12/13 at 120.)  The Trustee argues that this period represents
a time of financial stability for Eclipse and exemplifies
Prudential's ordinary extension of open trade credit on level
terms to financially stable customers.  The Trustee contends that
the parties operated on open 30-day credit terms which did not
require billing review or a strict payment plan.  It was not
until the summer of 2007, when Eclipse started to fall behind in
payments, that Prudential placed it on the First Payment Plan.
See, e.g., Unsecured Creditors' Comm. v. Air Prods. & Chemicals,

21

Inc. (In re Color Title, Inc.), No. 96-76, 2000 WL 1050580, at *1
(Bankr. D. Del. July 25, 2000) (holding that the period for
analyzing the subjective element of the parties' relationship
should extend before the debtor became financially distressed).

Prudential responds that being placed on billing review did
not change the nature of the payments.  Ms. Williams-Varner
testified that the minimum payments sought in the Second Payment
Plan and the Amended Payment Plan were equal to Eclipse's then
current weekly "run rate" and were meant to ensure only that
Eclipse remained current so the AR would not further increase.
(Tr. 3/12/13 at 97-98.)  The Court does not accept Prudential's
assertion that the payments in the Second Payment Plan were
equivalent to Eclipse's weekly "run rate."  The payments under
the Second Payment Plan had the effect of dramatically reducing
Eclipse's AR balance which would not have occurred had they
simply been the amount of new invoices.

Prudential further argues that the payments received were in
the ordinary course because they were applied to multiple
invoices, which was consistent with the parties' entire payment
history.  Prudential also asserts that the Second Payment Plan
and the Amended Payment Plan were similar to the First Payment
Plan in November 2007 when Eclipse also fell behind in payments.
The amount of the First Payment Plan was in fact larger
($200,000) because Eclipse's weekly "run rate" was higher at that

time.  (Id. at 79-80.)   Thus, Prudential argues that being placed

on billing review and instituting a payment plan was in the

ordinary course of business between the parties.

The Trustee responds that it was Prudential's knowledge of

Eclipse's deteriorating financial condition that prompted the

Second Payment Plan.  In an internal Prudential email, dated

September 3, 2008, Prudential commented on the deteriorating

financial situation at Eclipse:

> They are in financial instability and [we] . . . are
> very concerned about our exposure . . . . [L]ast year
> they also hit hard times with us but eventually got
> caught up after we cut them off, though that nearly
> ended our relationship with them.  Not the same
> approach we want today unless we want to end the
> relationship, which would then lead to whether we would
> see any funds at all.

(Pl. Ex. 23.)   Thus, the Trustee notes that Prudential had direct

knowledge of Eclipse's financially deteriorating circumstances

and chose to implement the Second Payment Plan and the Amended

Payment Plan to stave off any losses.   See, e.g., Hechinger Inv.

Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re

Hechinger Inv. Co. of Del., Inc.), 489 F.3d 568. 578 (3d Cir.

2007) (finding that the creditor had failed to prove the

transfers were in the ordinary course of business where "a month

before the beginning of the preference period, [the supplier]

tightened its credit terms, imposed a credit limit, required [the

debtor] to make payments by wire transfer in large, lump-sum

amounts, and required [the debtor] to send remittance advices

after making payment on invoices"); <u>J.P. Fyfe, Inc. of Fla. v.
Bradco Supply Corp.</u>, 891 F.2d 66, 67-68 (3d Cir. 1989)
(concluding that creditor failed to prove transfers were in the
ordinary course of business because creditor significantly
changed the parties' credit arrangements by deferring the
debtors' past debt of $500,000 indefinitely in exchange for
payment of $130,000 per month for future deliveries).

Similarly, the Court finds that the credit terms between the
parties in this case changed significantly during the Preference
Period after Prudential learned of Eclipse's rising AR balance
and its deteriorating financing condition.  The required weekly
payments of $75,000 were significantly different from the
original credit terms which required payment within 30 days of
invoice.

Further, the fact that Eclipse was placed on a similar
accelerated payment plan for three months at sometime in the past
does not make the payment plans ordinary.  <u>Cf.</u>, <u>Montgomery Ward</u>,
348 B.R. 662, 678-79 (Bankr. D. Del. 2006) (holding that
recurrent negotiations of credit terms between parties throughout
the business relationship tends to make them ordinary); <u>NSC
Creditor Trust v. BSI Alloys, Inc. (In re National Steel Co.)</u>,
341 B.R. 229, 237-38 (Bankr. N.D. Ill. 2006) (holding that the
parties' customary renegotiation of contract terms fell under the
ordinary course defense because nothing had changed).  The First

24

Payment Plan and the Second Payment Plan were not simply a renegotiation of the contract, they were unilateral pressure by Prudential on Eclipse to assure future payment.  Such undue credit pressure, even if conducted twice in the parties' three year business relationship, is a zealous creditor's attempt to collect on a debt and does not constitute the ordinary course of business.  See, e.g., Universal Forest, 489 F.3d at 578 (holding that pressure to make accelerated payments was "extreme and out of character with the long historical relationship between these parties").

Consequently, the Court finds that payments under the Second Payment Plan and Amended Payment Plan were not in the ordinary course of business practices of the parties in this case.

2.  New Value

Section 547(c)(4), known as the new value defense, "allows a creditor to retain an otherwise voidable preference if the creditor gave the debtor new value after the preferential transfer."  N.Y.C. Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y.C. Shoes, Inc.), 880 F.2d 679, 679 (3d Cir. 1989).  See also 11 U.S.C. § 547(c)(4).  Section 547(c)(4) imposes three requirements: (i) "the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b)," (ii) "after receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured

25

basis," and (iii) "the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition." Schubert v. Lucent Tech. Inc. (In re Winstar Commc'ns., Inc.), 554 F.3d 382, 402 (3d Cir. 2009).

The parties agree that new value exists and only dispute the amount.  The Trustee concedes that the amount of new value is $56,057.42, while Prudential argues that new value exists in the amount of $128,379.40.

Ms. Williams-Varner for Prudential prepared a chart setting forth new services rendered during and after the Preference Period and the corresponding invoices (the "Chart").  (Def. Ex. A.2.)  The Chart is composed of four groups of invoices that correlate to specific Transfers to Prudential, totaling $128,379.40.  The Trustee's main argument is that the last column comprised of 21 invoices, dated March 5, 2009, in the amount of $71,808.03 for household goods insurance charges does not qualify for new value pursuant to section 547(c)(4), because Prudential failed to prove the dates when the actual services were provided. See, e.g., First Jersey Sec., 180 F.3d at 511 (holding that a debt arises when legal services are provided, not when an invoice is issued).  Therefore, the Trustee maintains that Prudential failed to satisfy its burden under section 547(c)(4).  See, e.g., TWA Inc. Post Confirmation Estate v. City and Cnty. of SF. Airports Comm'n (In re TWA, Inc. Post Confirmation Estate), 305

B.R. 221, 228 (Bankr. D. Del. 2004) (holding that defendant must
prove when the services were rendered to establish that the new
value exception applies).

Prudential responds, however, that Ms. Williams-Varner
testified that an expense for household goods insurance was
automatically triggered once a move was completed and resulted in
an invoice the following week.  (Tr. 3/12/13 at 104.)  Ms.
Williams-Varner testified that for household goods insurance,
Prudential paid the invoice at the time of closing on the sale of
the employee's home.  (Id. at 106-07.)  The invoice to Eclipse
for those expenses would take one week after the closing to be
generated.  (Id. at 104.)  Thus, Prudential argues that it
satisfied its burden under section 547(c)(4) to establish the
date of the services for household goods insurance, namely one
week before the invoice date.

The Court finds the testimony of Ms. Willams-Varner
persuasive and uncontested and agrees with Prudential that it has
carried its burden of proof regarding its new value defense for
those invoices.  The Chart lists a payment date of November 20,
2008, for the household goods insurance invoices at issue, which
were performed approximately one week before March 5, 2009.

The Trustee also asserts that 17 invoices dated September
26, 2008, in the amount of $520 each for a home sale cancellation
fee and three invoices in the amount of $75 each for a household

27

goods cancellation fee did not constitute new value because they are not part of the Relocation Services.  Prudential responds that cancellation requires services such as system documentation and notice to various vendors that closely relate to the Relocation Services.  Ms. Williams-Varner testified that cancellation fees were generated when the service was canceled and the cancellation date was included on the invoice.  (Tr. 3/12/13 at 103-04.)

The Court concludes that the cancellation fees were attributed to Prudential's Relocation Services because work was done in connection with the cancellation.  Thus, the Court finds that Prudential has a new value defense in the amount of $128,379.40, against the preferential transfers of $781,702.61.


V.   <u>CONCLUSION</u>

For the reasons stated above, the Court will enter judgment in favor of the Trustee in the amount of $653,323.20.

An appropriate Order is attached.


Dated: July 17, 2013                    BY THE COURT:

                                        Mary F. Walrath
                                        United States Bankruptcy Judge

28